In re COLEMAN AMERICAN MOVING SERVICES, INC., an Alabama Corporation, Debtor.

COLEMAN AMERICAN MOVING SERVICES, INC., Plaintiff,

v.

J. L. TULLOS and Air Force Contracting Office at Keesler Air Force Base, Mississippi; United States of America and Department of the Air Force, Defendants.

Bankruptcy No. 80–40159.
Adv. No. 80–0232.

United States Bankruptcy Court,
D. Kansas.

Dec. 31, 1980.

R. Pete Smith, McDowell, Rice & Smith, Kansas City, Kan., for debtor.

Mary K. Briscoe, Asst. U. S. Atty., for the District of Kansas, Topeka, Kan., for the defendants.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

### Introduction

This proceeding came before the Court for trial on the debtor's complaint for injunctive relief against the defendants. Trial on the merits was combined with a hearing on a preliminary injunction and was held on December 23, 1980.

The debtor contends that the defendants have discriminated against it in violation of Section 525 of Title 11 U.S.C. The purported discrimination occurred during consideration of the award of a service contract at Keesler Air Force Base, Mississippi. The contract is for packing and crating personal belongings. The debtor was low responsive bidder but was not awarded the contract. The debtor contends that the contract denial had as its basis the debtor's Chapter 11 proceeding. Further action by the defendants was sought to be enjoined until it could be determined if 11 U.S.C. § 525 was violated in considering the debtor's bid and eligibility.

The defendant contends that this Court lacks jurisdiction of the controversy. The defendants further contend that no factual basis exists which would justify the relief the debtor seeks.

At trial, the debtor presented testimony through one of its officers, Douglas Coleman. In addition to the testimony of Mr. Coleman, three exhibits consisting of the submission to Keesler Air Force Base in response to the solicitation, a letter advising the debtor it would not be awarded the contract and a combined balance sheet for Coleman American Moving Services were admitted in evidence. The defendants submitted two exhibits, a multi-page document captioned pre-award survey and a document entitled Determination of Nonresponsibility DAR 1-904. The defendant presented no witnesses.

### FINDINGS OF FACT

The debtor filed its petition in Chapter 11 of Title 11 U.S.C. on March 5, 1980. Since

that date, the debtor has operated its extensive moving and storage business and has performed on its various contracts including a number of existing contracts through the Department of Defense with the various armed services. Apparently Department of Defense contracts for moving and storage are renewable annually through competitive bidding.

In this instance, the Air Force solicited bids for fulfillment of its packing and crating requirements for Keesler Air Force Base, Mississippi through Solicitation F22600–80–B–0072. Two bids were received. The debtor submitted the low responsive bid of approximately $24,000; however, subsequent to a pre-award survey conducted pursuant to Defense Acquisition Regulation (DAR) 1–902, the debtor was determined to be nonresponsible. It is this pre-award survey conducted by the Defense Logistics Agency, Defense Contract Administration Services Management Area–Birmingham (DCASMA–Birmingham) which the debtor attacks. It is during this study that the debtor contends improper consideration of the debtor's Chapter 11 filing was given and 11 U.S.C. § 525 violated.

The debtor has a number of bids outstanding on contracts similar to the instant contract with the Army, Navy and Air Force. Several contracts have been awarded the debtor and the debtor has been advised it is low bidder on others on which awards have not been made. The DCASMA for at least one of the unawarded contracts where the debtor is low bidder is apparently Denver; however, DCASMA–Birmingham is known to have corresponded either voluntarily or as part of Air Force requirements with at least one base contracting office other than at Keesler and advised of its recommendation on the Keesler nonaward, either verbally or in writing.

In order to be qualified for and be awarded a contract, the debtor must (1) have the necessary operating authorities, (2) the proper insurance, (3) an operating company, (4) technical capability, (5) necessary facilities and equipment, (6) sufficient labor resources, (7) financial capability, and (8) the ability to meet the required schedule. The pre-award survey and the reports reflect that the first six items were met by the debtor but that the debtor's financial capability and that its ability to meet the required schedule was unsatisfactory. On November 26, 1980, by letter from J. L. Tullos, Contracting Officer, the debtor was advised that because it was having financial difficulty which would substantially impair its ability to perform the services required, its bid could not be considered for award. The letter as well as the adverse comments in the pre-award report refer to DD Form 1524–3 as containing the basis for the reporter's opinion that the debtor lacks financial capability. In reviewing DD Form 1524–3, it is noted that only pertinent financial information is contained at page 1 of 3. The current assets of the debtor are recited as $1,775,487 while the current liabilities are recited as $4,230,396. The net sales for the period January 1 to September 30, 1980 are reported as $5,100,556, while net profit for this period is shown as a $352,686 net loss. The debtor's total liabilities are reported in excess of its total assets resulting in a negative net worth. The debtor's net worth is reported as a minus $886,598. A review of the balance sheet from which the pre-award survey information was admittedly obtained reflects that DD Form 1524–3 is substantially in error. Assets liquid and fixed total $3,956,548. The figure $1,775,486 reported on DD Form 1524–3 represents only cash, receivable and inventory. It does not include fixed assets such as land, buildings, equipment and intercompany receivable totaling in excess of two million dollars. The DD Form 1524–3 thus reflects an erroneous liability vs. asset picture. Testimony admitted at trial would indicate that the real property valued at approximately $674,000 is valued at original cost rather than current appreciated value. The $352,686 net loss on DD Form 1524–3 is actually a net profit of $352,686 as reported on the balance sheet and profit and loss statement provided the defendants. The net profit figure is the last figure in the profit and loss statement. Each figure on that statement is ascribed a percentage.

The net profit figure is said to be 6.91 percent. Immediately above the net profit figure is the total expense figure. That figure is $4,747,899.43 and is said to be 93.09 percent. The $5,100,555.74 total revenue figure also reported is one of the first figures on the profit and loss statement and is given the percentage 100.

The debtor, upon learning of contracting officer Tullos' letter to it of November 26, 1980, inquired as to what specifically was wrong. Upon learning that the report reflected a $352,686 net loss rather than a $352,686 net profit, that fact was pointed out to the contracting officer. This error was made known to DCASMA–Birmingham and on November 28, 1980 DCASMA–Birmingham acknowledged its error amounting to a $705,372 difference in cash flow for the first nine months of 1980. The chairman of the pre-award board stated that correction of this error did not affect the recommendation of no award. The understated assets on the defendants' report were not known by the debtor in November, 1980, and DCASMA–Birmingham, having been led to one error, apparently conducted no further review and thus did not discover any other apparent errors of understating assets. No further contacts were made with or questions put to the debtor pertaining to its financial condition or the bare balance sheet and profit and loss statement submitted the defendants. The determination made on November 13, 1980 by DCASMA–Birmingham "the offeror has a negative working capital and he has filed his reorganization plan which has not been approved by the Bankruptcy Court, we cannot recommend award of this contract." stands despite the substantial error discovered between November 26 and 28, 1980 and despite the failure of the DCASMA–Birmingham to report the assets and liabilities of the debtor as reported in the source document.

## CONCLUSIONS OF LAW

*Jurisdiction:* The jurisdiction of this Court is initially provided in 28 U.S.C. § 1471. Specifically, the bankruptcy court has original jurisdiction of all proceedings arising under Title 11 or arising in or related to cases under Title 11. The bankruptcy court also has exclusive jurisdiction of all property of a debtor wherever located as of the commencement of the case. Section 106(c) of Title 11 provides that notwithstanding any assertion of sovereign immunity any provision of Title 11 applying to creditors, entities or governmental units applies to governmental units and a determination by the bankruptcy court of an issue arising under such a provision binds governmental units. Thus it is seen that if a section of Title 11 is applicable to a governmental unit, sovereign immunity is waived and the bankruptcy court has jurisdiction to hear, decide and enforce its decision.

Section 525 of Title 11 in part reads as follows:

*"a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act."*

If the language of § 525 encompasses the instant situation the Court may decide the question posed and the defendants are bound by that decision. If the language does not encompass the situation, the defendant is not in this instance bound by the statute and the Court may not bind the defendant by a decision adverse to it.

■ The language of § 525 does apply and is intended to apply to the instant situation. The debtor relies on the term employment found in § 525 to describe its situation. The government equates the term employment with solely personal services as a wage or salaried employee and then states that such contracts of employment for wage or salary cannot be entered into by the Air Force. The term employ or employment is common usage is not so limited. Section 525 is not the regulation of a governmental unit with attendant limited definition of terms as promulgated by the unit. The section is a general statute, the terms of which are defined by common usage. The term employment is defined as the state of being employed. To employ is to use or engage the services of albeit another meaning is to provide a job which pays wages or a salary. *Websters New Collegiate Dictionary*. In common parlance one can be employed at many activities, not all of which are for salary or wages.

Even if a more restrictive use of the word employment would be applicable, the legislative history of § 525 as well as the public policy in favor of encouraging successful reorganization, would militate for inclusion of the instant situation within the language of § 525. See H.Rept.No.95–595, pp. 366, 367, U.S.Code Cong. & Admin.News 1978, p. 5787; *Matter of Aurora Cord and Cable Co.*, Bkrtcy., 2 B.R. 342, 1 CBC2d 486.

As recited by the legislative history § 525 has as its basis *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) and its progeny, i. e. *Henry v. Heyison*, D.C., 4 B.R. 437; *Grimes v. Hoschler*, 12 Cal.3d 305, 115 Cal.Rptr. 625, 525 P.2d 65. The enumeration of possible instances of discrimination therein is not exhaustive. It was perceived by Congress that all instances of discrimination may be levied against as the debtor's ability to gain a fresh start or to earn a livelihood or in this instance its ability to successfully reorganize is to be protected.

*Decision on the Merits*: The central question is whether or not the defendants have discriminated against the debtor in violation of § 525. If the defendants are discriminating, without the relief sought the debtor will be irreparably harmed. The debtor will lose this contract and, judging from the communication which has already occurred, its opportunities on other government contracts will be diminished. This, of course, would result in a diminished opportunity for successful reorganization. The defendants would not be harmed since a decision adverse to them merely requires them to abide by the laws passed by Congress. The debtor has no adequate remedy at law in that mere financial gain at some future date through a damage suit would be insufficient to compensate for lost opportunity at government business and come at a time when reorganization had either succeeded or failed despite or on account of the discrimination.

The policy of Title 11 is for reclamation of debtors. This policy weighs heavily against any possible inconvenience caused by a decision requiring these defendants to obey the law.

The evidence discloses that the debtor cleared six of the eight hurdles necessary for it to have been awarded this contract. The hurdles not cleared by the debtor concern its finances and questions emanating from perceived financial problems. The legislative history of this section would allow an examination of the factors surrounding the filing of the petition in bankruptcy court, the imposition of financial responsibility rules if imposed in a nondiscriminatory fashion, and the examination of managerial ability or prospective financial condition of the debtor. See H.Rept.No.95–595, pp. 366, 367.

In this case all the Court has before it is the testimony of an officer of the debtor and a number of exhibits. No defense witness appeared or testified. The exhibits and testimony show a debtor who filed a Chapter 11 petition on March 5, 1980. That debtor had a cash flow problem. During the first nine months of the year, six of which were spent in Chapter 11, the debtor had a net profit before taxes of $352,686. According to the balance sheet in evidence,

the debtor's assets slightly exceed its liabilities thus creating a positive net worth. The debtor has filed a plan of reorganization but the plan has not yet been distributed to creditors. The debtor has been performing on contracts similar to the instant contract during 1980 and has, according to the pre-award survey exhibit, had similar contracts at Keesler Air Force Base in the past.

It is more probable than not that the debtors problems did not arise overnight and that its negative current liabilities to liquid assets ratio has existed for some time. The debtor has been operating at a profit over the first nine months of 1980 and has apparently been carrying out its contractual obligations.

The defendants sought a financial statement from the debtor subsequent to the determination that it was low bidder. The defendants mistakenly reported a $352,686 net loss. They also reported a negative net worth where a positive net worth seems to exist. Based upon this erroneous information the debtor was said to be not qualified to receive the award. Upon being advised of one of their errors amounting to a $705,000 reversal in operating profit during the nine month period, the defendants, within one or two days, stated that the adjustment did not change the recommendation of no award. The defendants are not aware of what appear to be other errors in the financial aspect of their report.

The defendants' report in reality simply states that the debtor has current liabilities in excess of its available liquid assets. This condition, which has apparently existed for some time, is the reason the debtor sought relief in Chapter 11. The defendants discount a net profit in the first nine months. The defendants also discount the effect the Chapter 11 filing would have on all unsecured claims and to a lesser degree on secured claims which comprised its current liabilities at time of filing. The Court concludes from the reasons given in defendants' letter of November 26, 1980 to the debtor, the recommendation contained in DD Form 1524–3, the addendum to that report of November 28, 1980 and the remaining evidence and inferences drawn therefrom that the defendants did in fact discriminate against the debtor because it is a debtor or was insolvent before commencement of a case or during a case under Title 11.

The Court further concludes that the defendants are to be enjoined from discriminating against this debtor. The Court further concludes and directs the defendants to reconsider the debtor's bid in light of this opinion and 11 U.S.C. § 525.

The foregoing constitute Findings of Fact and Conclusions of Law under Bankruptcy Rule 752 and Rule 52(a) of the Federal Rules of Civil Procedure.