17 B.R. 845 (1982)
In the Matter of MARINE ELECTRIC RAILWAY PRODUCTS DIVISION, INC., Debtor.
MARINE ELECTRIC RAILWAY PRODUCTS DIVISION, INC., Plaintiff,
v.
NEW YORK CITY TRANSIT AUTHORITY, Union Switch and Signal Division of American Standard, Inc., Defendants.
Bankruptcy No. 180-05261, Adv. No. 181-0626.
United States Bankruptcy Court, E.D. New York.
February 26, 1982.
*846 Richard K. Bernard, Brooklyn, N.Y., for defendant New York City Transit Authority; Martin B. Schnabel and Kenneth J. Chertoff, Brooklyn, N.Y., of counsel.
Sullivan & Cromwell, New York City, for defendant Union Switch and Signal Division of American Standard, Inc.; Arline Mann, New York City, of counsel.
Finley, Kumble, Wagner, Heine, Underberg & Casey, New York City, for the debtor/plaintiff; A. Peter Lubitz, New York City, of counsel.
MANUEL J. PRICE, Bankruptcy Judge.
This is a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, by the New York City Transit Authority (NYCTA or THE AUTHORITY) and the Union Switch and Signal Division of American Standard, Inc. (UNION SWITCH) jointly, for an order dismissing the complaint, filed against them by Marine Electric Railway Products Division, Inc. (MARINE ELECTRIC or THE DEBTOR) for declaratory and injunctive relief and for damages arising from NYCTA's allegedly discriminatory treatment of the debtor in violation of Section 525 of the Bankruptcy Reform Act (THE CODE), 11 U.S.C. § 525.
To set this matter in proper perspective, a short summary of the facts follows:
On September 4, 1980, Marine Electric filed its petition for relief with this court under Chapter 11 of the Code, 11 U.S.C. § 1101 et seq. Its parent, Marine Electric Corporation, is also a Chapter 11 debtor in a case pending in this court. Since this date, Marine Electric has been operating its business as a debtor-in-possession in accordance with Section 1108 of the Code, 11 U.S.C. § 1108. This section provides that "[u]nless the court orders otherwise, the trustee may operate the debtor's business." In the absence of the appointment of a trustee, the debtor continues to operate its business *847 without the necessity of a court order. See 1979 Collier Pamphlet Edition of the Bankruptcy Code, Legislative History following Section 1108, p. 462.
The debtor is engaged primarily in the manufacture of electrical equipment for railway cars and ships. A significant portion of its business is derived from government contract work. According to the debtor, it has "entered into and satisfactorily performed numerous contracts with both federal and state governmental entities. . . ." (Plaintiff's Application for a Temporary Restraining Order, dated November 30, 1981, pp. 1-2)
On August 20, 1981, the NYCTA publicly solicited bids for the design and manufacture of "no motion detectors" to be installed in New York City's subway cars. (NYCTA Bid No. 12792) These devices will apparently lock the end subway car door while the train is in motion to prevent potential accidents. (S.M. December 29, 1981, p. 41)
In response to this solicitation, three prospective contractors, including Marine Electric and Union Switch, submitted bids. On September 9, 1981, the president of NYCTA advised Marine Electric by letter that its bid was the "apparent low bid" on the "no motion detector" contract. (Letter to Marine Electric from John D. Simpson, President, NYCTA, September 9, 1981, Exhibit A attached to the complaint)
Marine Electric offered to provide the required 1070 units at the cost of $563,890.00, or $527.00 per unit. Union Switch's bid was the second lowest at $1,014,360.00, or $948.00 per unit.
In his letter, however, Mr. Simpson informed the debtor that it was the intention of the Authority to award the contract to the second lowest bidder, namely Union Switch. The reason given for this decision was explained as follows:
"Please be advised that based on your financial statements, in particular, the pendency of a proceeding relating to your company under Chapter 11 of the Bankruptcy Act, this Authority finds that your company is not financially responsible to proceed with the above-mentioned contract. This determination is separate and apart from any question relating to your professional qualifications which, due to your financial status, have not been determined.
"In the opinion of the Authority the uncertainties of performance of this contract during a Chapter 11 proceeding are unacceptable. The Authority cannot accept the risks of the contract being voided either selectively or as part of a general liquidation." Id.

For purposes of this present motion, however, the Authority admits that its determination to reject Marine Electric's bid was in fact based "`solely on [Marine Electric's] status as a debtor-in-possession'" under Chapter 11 of the Bankruptcy Code. (Affidavit of Kenneth J. Chertoff, Esq., verified December 11, 1981 attached to NYCTA's motion to dismiss the complaint, p. 2, quoting from paragraph 10 of plaintiff's complaint)
In an attempt to reverse this determination, A. Peter Lubitz, Esq., an attorney associated with Finley, Kumble, Wagner, Heine, Underberg & Casey, Esqs., the attorneys for the debtor, wrote Mr. Simpson of the NYCTA on September 16, 1981. As part of this effort, Mr. Lubitz asked that a meeting be held between NYCTA, Marine Electric and their respective counsel "for the purpose of discussing the issues and concerns raised" as the result of NYCTA's decision to withhold the contract from the debtor. (Letter to John D. Simpson from A. Peter Lubitz, dated September 16, 1981, Exhibit B attached to the complaint) In addition, it was requested that the contract not be awarded in the interim during which the NYCTA would reconsider its decision. In support of his requests, Mr. Lubitz made reference to the provisions of Section 525 of the Code, 11 U.S.C. § 525, and enclosed a copy of a recent bankruptcy court decision construing this statute, In re Coleman American Moving Services, Inc., 8 B.R. 379, 7 B.C.D. 142, 3 C.B.C.2d 609 (Bkrtcy.C.D. Kan.1980). Section 525 states:
"Except as provided in Perishable Agricultural Commodities Act, 1930 (7 U.S.C. *848 §§ 499a-499s), the Packers and Stockyards Act, 1921 (7 U.S.C. §§ 181-229), and section 1 of the Act entitled `An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes,' approved July 12, 1943 (57 Stat. 422; 7 U.S.C. § 204), a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act."
On October 5, 1981, Richard K. Bernard, Esq., General Counsel to the NYCTA, responding to Mr. Lubitz's letter, essentially reiterated the Authority's refusal to accept Marine Electric's bid. Specifically, he reminded Mr. Lubitz that NYCTA found Marine Electric to be "`not a Responsible Bidder;'" cited various deficiencies in Marine Electric's financial status; and rejected Mr. Lubitz's reliance on Section 525 of the Code, 11 U.S.C. § 525, and the Coleman decision. Mr. Bernard did, nevertheless, agree to meet with representatives of Marine Electric with this caveat: "we feel that such a meeting would be worthwhile only if you can produce more concrete facts demonstrating from both professional and financial viewpoints your ability to complete this contract." (Letter to A. Peter Lubitz, Esq., from Richard K. Bernard, NYCTA General Counsel, dated October 5, 1981, Exhibit C attached to the complaint)
During the following week, Mr. Lubitz spoke with Kenneth J. Chertoff, Esq., of the NYCTA's General Counsel's Office. According to Mr. Chertoff's affidavit, he told Mr. Lubitz that the Authority would be willing to meet with him, but he advised that there was "little point in so doing. . . ." Additionally, he noted that "in any event, any action which [Mr. Lubitz] intended would have to be taken quickly in light of [Mr. Chertoff's] stated expectation that the contract would be awarded during the next few days if it had not in fact already been awarded." (Affidavit of Kenneth J. Chertoff, Esq., verified December 11, 1981 attached to motion to dismiss)
Mr. Lubitz then called Mr. Chertoff on October 28, 1981 to request that a meeting be scheduled and to inform him that to his knowledge the subject contract still had not been awarded. The following day, Mr. Chertoff telephoned Mr. Lubitz to tell him that although the contract still had not been awarded, such award "was in fact most imminent." Id. During this conversation, a meeting was scheduled for November 4, 1981.
Finally, on October 30, 1981, the contract was awarded to Union Switch (NYCTA Acceptance and Order No. 11483, dated October 30, 1981, Exhibit A attached to NYCTA's motion to dismiss the complaint), whereupon Mr. Chertoff notified Mr. Lubitz of this fact. Mr. Lubitz, at this point, indicated that he was still desirous of meeting with representatives of the Authority. Thus, on November 4, 1981, a meeting was held which resulted in no change in the positions of either of the parties.
Approximately a month later, on December 3, 1981, Marine Electric filed its complaint against NYCTA and Union Switch in which it requested a preliminary injunction and then a permanent injunction enjoining the Authority from awarding the "no motion detector" contract to any entity other than the debtor or, in the alternative, for damages. Simultaneously it applied for an order to show cause why a temporary restraining order should not issue against the *849 Authority and why an injunction pendente lite should not issue. That motion was made returnable on December 21, 1981. In the meantime, NYCTA and Union Switch made motions to dismiss the complaint which were returnable at the same time.
As to the debtor's application for the temporary restraining order, I heard counsel in chambers on December 21, 1981, after which I denied the application due to the fact that the contract had already been awarded to Union Switch. I adjourned the hearing on the application for an injunction pendente lite and the motion to dismiss the complaint to December 29, 1981. Parenthetically, at this time the Authority conceded, for the purpose of the motion to dismiss, that the "sole" reason that Marine Electric was by-passed as the responsible low bidder was its status as a Chapter 11 debtor.
It should be noted that during the period of time in which Union Switch was first awarded the contract on October 30, 1981 and up to the date of this hearing, Union Switch proceeded to work on the project. As of December 28, 1981, Union had spent more than $39,000.00 on the project for salaries and materials. (Affidavit of Elizabeth M. Ross, Project Administrator, Union Switch, sworn to December 23, 1981 and filed December 28, 1981)
There are two primary issues involved in this motion. The first concerns whether Section 525 of the Code, 11 U.S.C. § 525, applies to the parties and the type of discrimination and injury claimed to have been incurred by the plaintiff-debtor. Assuming this section is held to be so applicable, the second issue would necessarily require the determination of whether the debtor has alleged a claim which would entitle it to the relief it has requested.
Based on my analysis of Section 525, I believe that it applies to the two principal parties in this matter, the NYCTA and Marine Electric.
Section 525 expressly prohibits a "governmental unit" from committing various discriminatory acts against debtors seeking relief under the bankruptcy laws. "Governmental unit" is defined in Section 101(21) of the Code, 11 U.S.C. § 101(21), as the following:
"`governmental unit' means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government. . . . "
The Senate Report which accompanied the new Code as it was proposed states that this provision defines "governmental unit" in the "broadest sense." S.Rep.No.95-989, 95th Cong., 2d Sess. 24 (1978), U.S.Code Cong. & Admin.News, p. 5787.
As a result of this expansive definition of "governmental unit," Section 525 has been held to proscribe explicitly discrimination by "any" governmental entity, In re Heath, 3 B.R. 351, 352 (Bkrtcy.C.N.D.Ill., E.D.1980) (original emphasis), as well as to "quasi-governmental units." Id. at 353; see also 3 Collier on Bankruptcy ¶ 525.01, p. 525-1-2, (15th ed. 1981). Consequently, a state university, In re Howren, 10 B.R. 303 (Bkrtcy. C.D.Kan.1980); In re Heath, supra; a municipal housing authority, In re Gibbs, 9 B.R. 758 (Bkrtcy.C.D.Conn.1981); and a state liquor authority, In re Maley, 9 B.R. 832 (Bkrtcy.C.W.D.N.Y.1981); have been held to be "governmental units" within the meaning of Section 525.
The NYCTA is a city agency composed of a board consisting of the Chairman of the Metropolitan Transportation Authority of New York State and twelve other board members. The NYCTA, as a subdivision of the Metropolitan Transportation Authority which is itself a state agency, provides public subway service in four New York City counties and bus service in all five city counties. See City of New York Official Directory 1981-82, p. 270.
Based on this description of the composition and responsibilities of the NYCTA and on the fact that it is in essence a municipal entity, the Authority is without doubt a governmental unit covered by Section 525.
*850 The next consideration involves determining whether Section 525 applies to Marine Electric in its capacity as a debtor-in-possession under Chapter 11 of the Code. Again, the courts have broadly interpreted the provisions of this statute by not limiting its protections to the discharged debtor alone. Instead, the courts have recognized that the "proscripts" of Section 525 are applicable to discriminatory actions against any debtor seeking protection under the bankruptcy laws, regardless of whether or not the debtor has obtained a discharge. In re Heath, 3 B.R. at 353; see also In re Howren, supra; 3 Collier on Bankruptcy ¶ 525.01, p. 525-2. As one court explained:
"Indeed, it would be anomalous to grant a debtor protection from discriminatory actions in a liquidation proceeding and deny him the same protection in a rehabilitation (Chapter 13) proceeding." In re Heath, 3 B.R. at 354.
The final factor regarding the applicability of Section 525 to the instant matter is essentially a bifurcated consideration. The first requires finding whether the type of discrimination complained of here is that prohibited by Section 525. The second necessitates determining whether the impairment or damage claimed to have been suffered by the debtor as a result of the alleged discrimination is contemplated by the statute.
Section 525 only prohibits discrimination by public entities and therefore is inapplicable to discrimination stemming from private sources. Under the new Code and its predecessor, the Bankruptcy Act, as well as the Supremacy Clause of the United States Constitution, the courts have carefully delineated between public and private discrimination. See, e.g., Girardier v. Webster College, 563 F.2d 1267 (8th Cir. 1977) (discrimination by private college against discharged bankrupt permissible); Handsome v. Rutgers University, 445 F.Supp. 1362 (D.N.J.1978) (discrimination by state university against discharged bankrupt held to be impermissible as public discrimination); Lee v. Board of Higher Education, City of New York, 1 B.R. 781 (S.D.N.Y. 1979) (invalidates discrimination by municipal college); In re Barbee, 14 B.R. 733 (Bkrtcy.C.E.D.Vir.1981) (bank could discharge employee on basis of his filing a Chapter 7 petition for relief); In re Coachlight Dinner Theatre of Nanuet, Inc., 8 B.R. 657 (Bkrtcy.C.S.D.N.Y.1981) (private radio station could refuse to accept advertising from Chapter 11 debtor); In re Northern Energy Products, 7 B.R. 473 (Bkrtcy.C.D. Minn.1980) (Better Business Bureau not a governmental unit under provisions of Section 525).
In our case, the allegedly discriminatory entity is the NYCTA. As previously analyzed, the NYCTA is a municipal agency and a subdivision of a state agency. In addition, the "no motion detector" contract is a public purchase contract that would benefit New York City's subway transit system. Furthermore, the means the NYCTA utilized to acquire bids for the contract was a public solicitation, as mandated by Section 1209(2) of the New York Public Authorities Law, N.Y.Pub.Auth.Law § 1209(2) (McKinney, Supp.1981-82). This statute provides:
"2. Any purchase contract, including but not limited to contracts for the purchase of equipment, materials or supplies, the estimated cost of which exceeds the sum of ten thousand dollars, shall be made by the authority only upon public letting founded on sealed bids, except in a case where the authority, by resolution, declares the existence of an emergency or the existence of other circumstances making competitive bidding impracticable or inappropriate, except in no instance other than in circumstances such as described in paragraph (g) hereof, shall the authority declare that competitive bidding is inappropriate with respect to purchase contracts for omnibuses. In each instance when the authority declares competitive bidding inappropriate it shall state the reasons therefor. Competitive bidding may be declared inappropriate by the authority in instances (a) where the thing to be purchased is available only from a single source; or (b) where professional *851 engineering or architectual services are solicited; or (c) where only a single bid is received in response to an invitation for competitive bids; or (d) where the authority has chosen to standardize a component on the basis of compatibility or maintenance reliability; or (e) where the apparent low bidder is declared by the authority to be not qualified to perform the terms of the contract; or (f) where the authority wishes to experiment with or test a new product or technology or evaluate the service or reliability of a new source for a particular product or component; or (g) where the authority by a vote of two-thirds of its members then in office determines that its prior experience with a potential source or contractor has been such as to require, in the public interest, that such source or contractor not be considered eligible to bid and that after the elimination of said source or contractor from the bidding process there would effectively remain only a single source for the item to be purchased and the authority purchases the item from such source; or (h) where the authority by a two-thirds vote of its members determines, on the basis of its analysis of the competitive situation among potential sources for the item to be purchased, is such that it is in the public interest to encourage new sources of manufacture or supply by awarding a contract by negotiation and without competitive bidding. Notice of the invitation for such bidding shall state the time and place of the receipt and opening of bids and shall be published in the city record in five successive issues at least ten days preceding such opening. The authority may reject all such bids and readvertise for new bids if it shall deem it for the public interest so to do. If not, it shall award the contract to the lowest responsible bidder unless the authority, by unanimous vote, shall determine that it is for the public interest that a bid other than that of the lowest responsible bidder shall be accepted."
In all respects, therefore, the Authority has engaged in public activities in its official capacity as a municipal governmental agency. Consequently, any action deemed to be in derogation of the anti-discrimination policy of Section 525 by the Authority would properly be labeled public discrimination and thus within the scope of this section.
The primary contention of the defendant-NYCTA is, however, that Section 525 was not intended to apply to the public letting of contracts by a governmental agency. In support of this argument, the NYCTA primarily relies on the words of the statute itself.
Section 525 specifically lists various activities that cannot be discriminatorily performed by governmental units against debtors. The section enumerates these activities in the following:
"a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against . . . [a debtor]."
The plaintiff/debtor, on the other hand, argues that the provision's use of the word "employment" was intended to encompass the letting of contracts, as is involved in this case.
The legislative history of Section 525 indicates that Congress sought to attack in a broad manner discriminatory practices by governmental entities. As the Senate Report notes in relevant part:
"The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the Perez rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such *852 as exclusion from a union on the basis of discharge of a debt to the union's credit union." S.Rep.No.95-989, 95th Cong., 2d Sess. 81 (1978), U.S.Code Cong. & Admin. News at p. 5867.
In fact, Congress appears to have expressly intended to give the Courts the responsibility to refine and define further the scope and limitations of Section 525 as it applies to various discriminatory acts. The Senate Report states that the courts "will continue to mark the contours of the antidiscrimination provision in pursuit of sound bankruptcy policy." Id.
In fulfillment of this responsibility, the courts have broadly interpreted the applicability of Section 525. Such a pre-disposition by the courts to construe this statute broadly was in fact predicted after the Code was first enacted. See H. Miller and M. Cook, A Practical Guide to the Bankruptcy Reform Act, p. 414 (1979) ("It is most likely that the many varieties of governmental discrimination will not be narrowly construed.") The protections of this section have been considerably extended beyond those activities enumerated in the provision. Examples of this expanded construction of Section 525 include the following: a governmental agency may not discriminate against a Chapter 11 debtor in the award of a service contract, In re Coleman American Moving Services, Inc., 8 B.R. 379, 7 B.C.D. 142, 3 C.B.C.2d 609 (Bkrtcy.C.D.Kan.1980); a state law requiring a debtor to purchase financial responsibility insurance is unconstitutional Henry v. Heyison, 4 B.R. 437 (Bkrtcy.E.D. Pa.1980); see also In re Layfield, 12 B.R. 846 (Bkrtcy.C.N.D.Ala., S.D.1981); In re Duffey, 13 B.R. 785 (Bkrtcy.C.S.D.Ohio, E.D.1981); state university cannot deny Chapter 13 debtor a transcript, In re Heath, supra; In re Howren, supra; a state-aided housing authority may not evict a discharged debtor, In re Gibbs, 9 B.R. 758 (Bkrtcy.C.D.Conn.1981); a debtor's status as a self-insurer under a state workers compensation act that was summarily suspended by reason of his filing a petition for relief held void as discriminatory, In re Hillcrest Foods, Inc., 10 B.R. 579 (Bkrtcy.C. D.Me.1981).
It is clear from the legislative history of Section 525 and the progeny of decisions interpreting it that the section's "list of discriminatory practices is not exhaustive." B. Weintraub and A. Resnick, Bankruptcy Law Manual (1980) p. 3-23.
The courts, in an effort to fulfill the anti-discriminatory purposes of Section 525, have applied the section's protections to a wide range of governmental activities. Surely, the NYCTA's letting of a contract for a public purchase project constitutes the type of governmental activity within the purview of Section 525.
This analysis, however, should not stop at the point at which Section 525 is found to be applicable to a certain governmental practice. The legislative history of Section 525 states unequivocally that this provision "codifies the result of Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). . . ." S.Rep.No.95-989, 95th Cong., 2d Sess. 81 (1978), U.S.Code Cong. & Admin.News at p. 5867.
In Perez, the Supreme Court, guided by the dictates of the Supremacy Clause of the United States Constitution, carefully examined whether a state motor vehicle financial responsibility statute conflicted with Section 17 of the former Bankruptcy Act, 11 U.S.C. § 35, which provides that the discharge in bankruptcy fully eradicates all but certain specified judgments. The crux of the Supreme Court's examination, it has been recognized, was a "two-step analysis" weighing the effect of the suspected governmental discrimination against the purposes of the bankruptcy laws. Grimes v. Hoschler, 12 Cal.3d 305, 115 Cal.Rptr. 625, 525 P.2d 65, 67 (1974); Rutledge v. City of Shreveport, 387 F.Supp. 1277, 1279 (N.D.La. 1975) ("two-step process").
Applying this mode of analysis to the instant case, we should first examine the policies underlying our system of bankruptcy laws and, in particular, those inherent in the system's provisions for rehabilitating a debtor through reorganization.
*853 It has long been recognized that one of the "primary purposes," Local Loan v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1049 (1934), of the bankruptcy laws, is to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." Williams v. United States Fidelity and Guaranty Co., 236 U.S. 549, 554-55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915); see also Stellwagen v. Clum, 245 U.S. 605, 617, 38 S.Ct. 215, 218, 62 L.Ed. 507 (1918) (The purpose of our "federal system of bankruptcy" is to "aid the unfortunate debtor by giving him a fresh start in life. . . . ")
One of the ways in which this "fresh start" policy is actuated by the Code is through those provisions enabling the debtor to rehabilitate itself through either individual or corporate reorganization through Chapter 11. Regarding the philosophy underlying the latter, Weintraub and Resnick explain:
"A basic assumption that underlies American bankruptcy law is that it is often preferable to encourage and facilitate rehabilitation of businesses in financial trouble instead of providing for liquidation only. From a broad perspective, rehabilitation is better for the economy because it minimizes unemployment and waste of business assets. It is much more productive to use assets in the industry for which they were designed instead of selling them as distressed merchandise at liquidation sales. Also, rehabilitating a business is in the best long-term interest of creditors and shareholders.
"Chapter 11 of the Bankruptcy Code provides a means by which a financially distressed business may restructure its finances so that it may continue its operation and avoid the auctioneer's hammer." B. Weintraub and A. Resnick, Bankruptcy Law Manual (1980), p. 8-3.
Vital to the successful rehabilitation of a debtor in reorganization is that the debtor be able to compete in the business community on as equal a level as possible to that enjoyed by those financially well-off businesses. Therefore, as one court observed, it would be "anomalous" to grant a debtor protection from discriminatory governmental actions in a liquidation proceeding and to deny that debtor the same protection in a rehabilitation proceeding. In re Heath, 3 B.R. at 354.
Turning to the facts on this motion, the NYCTA concededly rejected Marine Electric's bid for the sole reason that it was a debtor-in-possession under Chapter 11. The fears of the Authority that underpinned this decision were explained in a letter to the debtor:
"Since, by your own admission, you have been unable to produce an acceptable reorganization plan, we must consider a Chapter 7 proceeding to be a real possibility. We must further consider the possibility of the contract being voided as part of that Chapter 7 proceeding to be equally real. I should remind you, that a substitute contractor could not readily step in and take over this project. Rather, any new contractor would have to start the project from the beginning, after a bidding processes (sic), causing an incalcuable (sic) loss to the Authority. This risk, which is not present in our repair contracts with Marine, is one we cannot afford." (Letter from Richard K. Bernard, NYCTA General Counsel, to A. Peter Lubitz, Esq., Attorney for Plaintiff, dated October 5, 1981, Exhibit C attached to the complaint).
Notwithstanding the possible legitimacy of the NYCTA's fears, the effect of its actiondiscriminating against a bidder solely on the basis of its status as a Chapter 11 debtordoes not outweigh the vital rehabilitative purposes embodied in Chapter 11 and in the Code as a whole. I therefore must reject its contention that Section 525 is not applicable to the letting of contracts by governmental agencies.
Having found that the complaint alleges a claim against NYCTA for discrimination against the debtor in violation of Section 525 of the Code, the second question to be determined is does it state a claim for a *854 permanent injunction or, in the alternative, for damages.
Marine Electric first learned of the NYCTA's rejection of its bid and its intention to award the contract to the second low bidder in the September 9, 1981 letter that Mr. Simpson, president of the NYCTA, wrote to it. After receiving this information, it initiated a series of communications in an effort to persuade the NYCTA to change its decision. These efforts continued up to and beyond the day when the contract was finally awarded to Union Switch on October 30, 1981.
Even after this date, Marine Electric still persisted in pursuing negotiations with the NYCTA. It was not until December 3, 1981, nearly three months after it was originally informed of NYCTA's decision to award the "no motion detector" contract to the second lowest bidder and more than a month after the contract was actually awarded that it filed its complaint against the NYCTA in this court.
In its complaint, it seeks a permanent injunction or, in the alternative, damages of $200,000. Regarding its request for damages, I find no basis in Section 525 of the Code or in the underlying state statute regulating the award of contracts by public authorities, Section 1209(2) of the New York Public Authorities Law, N.Y.Pub. Auth.Law § 1209(2) (McKinney, Supp.1981-82), for such a remedy.
In the context of Section 525, the courts have only discussed injunctive measures and applications for court orders, not damages. See, e.g., In re Barbee, supra; In re Patterson, 10 B.R. 860 (Bkrtcy.C.E.D.Pa. 1981); In re Gibbs, supra; Henry v. Heyison, supra; In re Heath, supra. Plaintiff, however, relies on the Coleman decision as providing support for its contention that it is entitled to damages for NYCTA's violation of Section 525.
This reliance is misplaced. In Coleman, the debtor sought injunctive relief when it was informed that the Air Force Contracting Officer had rejected its low bid and before the contract was awarded to a higher bidder. After finding that the defendant-Air Force Contracting Officer had discriminated against the debtor in contravention of Section 525, the court held:
"The Court further concludes that the defendants are to be enjoined from discriminating against this debtor. The Court further concludes and directs the defendants to reconsider the debtor's bid in light of this opinion and 11 U.S.C. § 525." 8 B.R. at 384, 7 B.C.D. at 144-45, 3 C.B.C.2d at 615.
The only apparent reference to monetary damages by the Coleman court was its finding that "[t]he debtor has no adequate remedy at law in that mere financial gain at some future date through a damage suit would be insufficient to compensate for lost opportunity at government business. . . ." 8 B.R. at 383, 7 B.C.D. at 144, 3 C.B.C.2d at 614. This statement would appear to be at most a mere acknowledgement of the problems inherent in an action for damages.
Furthermore, the underlying state statute involved here, Section 1209(2) of the New York Public Authorities Law, has been construed by the courts of New York as not affording a plaintiff-bidder a right to damages resulting from a wrongful rejection under this provision. As the court observed in the case of Carroll-Ratner Corp. v. City Manager of New Rochelle, 54 Misc.2d 625, 628, 283 N.Y.S.2d 218 (Sup.Ct., Westchester County 1967), aff'd, 36 A.D.2d 795, 320 N.Y.S.2d 715 (1st Dep't 1971);
"In our opinion the New York cases holding that a rejected bidder may not sue at law for damages for loss of profits, (of which Molloy v. City of New Rochelle, 198 N.Y. 402 [92 N.E. 94] affg. 123 App. Div. [642] 624 [108 N.Y.S. 120] [2d Dept.] is a leading case), because he has neither a statutory right to damages for the improper rejection of his bid, nor a commonlaw right to damages for breach of contract, do meet the main thrust of the issue here presented, since petitioners' argument is basically that they are entitled to damages for breach by the City of a common-law contract, as hereinafter discussed. According to Molloy and similar *855 cases, a rejected bidder cannot have damages, because the statutes requiring the award of public contracts to the lowest responsible bidder were not enacted for the benefit of the private contractor, but for the protection of the municipal corporation and its taxpayers, and do not give to a rejected bidder an action for their violation; and because an unaccepted bid cannot sustain a contractual relation with the City or an action as upon contract." See also Molloy v. City of New Rochelle, 198 N.Y. 402, 92 N.E. 94 (1910), Allen v. Eberling, 24 A.D.2d 594, 262 N.Y.S.2d 121 (2d Dep't 1965); Kayfield Construction Corp. v. Morris, 15 A.D.2d 373, 378, 225 N.Y.S.2d 507 (1st Dep't 1962); accord Mason Stationery Products, Inc. v. New York, 65 A.D.2d 859, 410 N.Y.S.2d 379 (3d Dep't 1978) (no damages awarded for plaintiff-bidder's loss of business caused by removal from state's list of acceptable bidders).
The primary reason why the New York courts deny damage relief under the state's statutory provisions requiring the lowest responsible bidder to be accepted was explained in the following passage from Molloy v. City of New Rochelle, 198 N.Y. 402 (1910), at pages 406 to 407, more than seventy years ago:
"Such provisions are intended to prevent favoritism. They result from an effort to prevent official action being influenced by improper motives.
* * * * * *
"Such a statutory provision enacted as a protection to the [municipal] corporation cannot be used to make a disobedience of its provisions by the municipal officers a double source of punishment to the municipality. If the plaintiff is right in his contention then a disobedience of the provisions of the statute will make the municipality pay the difference between the lowest bid and the bid for which the contract is made and also the profit that the lowest responsible bidder would have made if the statute had not been violated. But such is not the purpose of the charter provision." See also Harran Transportation Co., Inc. v. Board of Education, 71 Misc.2d 139, 335 N.Y.S.2d 465 (Sup.Ct., Nassau County 1972).
Even where the rejected lowest bidder had secured an order to show cause enjoining a municipality from executing a contract with another entity, and the municipality nevertheless awarded the contract, damages were denied to the plaintiff-bidder. Carroll-Ratner Corp. v. City Manager of New Rochelle, supra.
Thus, simply by virtue of being the lowest bidder on a public contract, such bidder gains no "vested or property interest" that can be protected by the remedy of damages. Kayfield Construction Corp. v. Morris, 15 A.D.2d at 378, 225 N.Y.S.2d 507.
I turn now to address the debtor's alternate request for a permanent injunction. Marine Electric was originally informed of NYCTA's refusal to accept its bid on September 9, 1981. The contract was finally awarded on October 30, 1981. It commenced the present action in this court on December 3, 1981. From the time it first learned of the rejection of its bid to the time it sought relief, nearly three months passed. After learning that the contract had been awarded to Union Switch, it waited over a month before it filed its complaint in this court. During this month, Union Switch, the successful bidder, proceeded to work pursuant to the terms of the contract awarded to it. (See Affidavit of Elizabeth M. Ross, Project Administrator for Union Switch and Signal Division of American Standard, Inc. filed December 28, 1981).
Particularly in light of the nature of the relief sought by plaintiff, this delay was unreasonable. Even the case on which Marine Electric most strongly relies, In re Coleman, supra, involved at most a one month delay between the time when the debtor-low bidder was advised that its bid would not be considered and the time when a trial on the merits, combined with a hearing on a preliminary injunction, was held.
On the state level as well, timeliness of the injunctive action has been demonstrated *856 by the facts of those cases considering injunctive measures under various statutory provisions of New York. See, e.g., Kayfield Construction Corp. v. Morris, supra; Diocese of Rochester v. Planning Board, Town of Brighton, 1 N.Y.2d 508, 154 N.Y.S.2d 849, 136 N.E.2d 827 (1956).
Had Marine Electric, upon learning of NYCTA's decision, timely initiated a proceeding for injunctive relief under Article 78 of the Civil Practice Law and Rules, N.Y.C.P.L.R., Art. 78 (McKinney 1981) in the state courts or commenced a similar action in this court, prior to the award of the contract, then the merits of such a remedy would have been unassailable. Instead, the plaintiff waited until three months transpired and, most importantly, until after the contract was awarded and work begun thereon, before taking action. Such a delay negates the very purpose for which an injunction serves.
Based on these considerations, I find that the complaint fails to state a claim upon which relief may be granted and it is dismissed.
Settle order within ten days from date hereof.