In re **PIER 5 MANAGEMENT CO., INC., Debtor.**

**PIER 5 MANAGEMENT CO., INC., Plaintiff,**

v.

**OCCOQUAN RIVERFRONT PARTNERSHIP, Defendant.**

**Bankruptcy No. 86–02004–A. Adv. No. 87–0013–A.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

March 11, 1988.

Robert O. Tyler, Alexandria, Va., for debtor.

Leslie Alden, McLean, Va., for defendant.

Henry Counts, Jr., Alexandria, Va., Trustee.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

This matter comes before the Court upon the complaint of Pier 5 Management Co., Inc. ("Debtor", "Pier 5") against its landlord, Occoquan Riverfront Partnership ("Partnership"), and the counter-claim of the Partnership against Pier 5. Each side seeks a declaration of the respective rights of the parties in respect to a twenty-year lease from the Partnership to Pier 5 of a restaurant located in Occoquan, Virginia.

After a trial lasting approximately seven (7) days, the Court took the matter under advisement.

The threshold issue here is whether the lease has been deemed rejected as a matter of law because the debtor failed to comply with the statutory requirements of 11 U.S. C. § 365(d)(4). This statute provides in pertinent part:

"... if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is a lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor." 11 U.S.C. § 365(d)(4).

Although numerous courts have considered § 365(d)(4), few of these decisions are applicable to the case at bar. Unlike some others, this Court is not asked to decide whether, after the 60–day period has passed, the Court may grant a motion filed within the 60–day period requesting assumption of a lease or an extension of time to assume or reject, because Pier 5 concedes no motion was timely filed here. *Cf. In re Wedtech Corporation*, 72 B.R. 464 (Bankr.S.D.N.Y.1987); *In re Bon–Ton Restaurant and Pastry Shop, Inc.*, 52 B.R. 850 (Bankr.N.D.Ill.1985). Neither must the Court decide whether the debtor may assume a lease by conduct other than filing a motion, since Pier 5 does not contend it unequivocally assumed the lease by conduct. *Cf. In re Treat Fitness Center, Inc.*, 60 B.R. 878 (9th Cir. BAP 1986); *In re BDM Corp.*, 71 B.R. 142 (Bankr.N.D.Ill. 1987); *In re Chandel Enterprises, Inc.*, 64 B.R. 607 (Bankr.C.D.Cal.1986); *In re Re-Trac Corporation*, 59 B.R. 251 (Bankr.D. Minn.1986). Still other cases consider whether a landlord's mere acceptance of rent constitutes a waiver of § 365(d)(4) or estops the landlord from asserting the 60–day limit, but Pier 5 does not raise this issue either. *Cf. In re Las Margaritas, Inc.*, 54 B.R. 98 (Bankr.D.Nev.1985). Rather, Pier 5 maintains that the Partnership should be estopped by a still different

course of conduct from asserting the forfeiture provisions of § 365(d)(4).

■ Pier 5 claims the following circumstances give rise to an estoppel: First, the Partnership knew that Pier 5 would not decide whether to assume or reject the lease until it could calculate with certainty the amount due as rent each month for the term of the lease, and the Partnership agreed that the rent term was directly related to the amount expended on construction of the restaurant. Although the Partnership had in its control, and Pier 5 did not have access to, the construction cost information needed to calculate the rent, the Partnership agreed to provide this information. Moreover, the Partnership, by counsel, conceded that the rent currently being paid may have been excessive. The evidence reveals that the Partnership failed to provide this information and, instead, insisted that the lease was deemed rejected because Pier 5 failed to move for an extension of time within which to assume.

■ In support of its position that the lease should be deemed rejected, the Partnership contends that, absent bad faith, equitable principles of estoppel are inapplicable to § 365(d)(4) because the statute was enacted to eliminate the uncertainty that often otherwise accompanied the status of unexpired commercial leases in bankruptcy. The Partnership denies any bad faith. Additionally, even if principles of estoppel may be applied in the § 365(d)(4) context, the Partnership maintains its conduct did not lull Pier 5 into inaction, so estoppel is not appropriate in this case.

At the outset, the Court notes that this issue would be moot had Pier 5 timely moved the Court for an extension of time to assume or reject the lease at issue. Unfortunately, Pier 5 did not take this preferred course. Nevertheless, it is clear that cause for an extension did exist. Counsel for the Partnership conceded that the alleged construction costs were "pretty high" but failed to provide the documentation to support the rent demanded, all the while promising to do so. As the Partnership was well aware, Pier 5 was prevented from making a proper business judgment

without the requested information. It is clear that the actions of the Partnership induced Pier 5 to forgo requesting an extension of time. It is particularly disingenuous of the Partnership to demand the benefit of § 365(d)(4) when its own action created the reasonable belief in Pier 5 that negotiations over the disputed rent were ongoing. Furthermore, as noted below, the Partnership's default in delivering the leased premises was the source of the rent dispute. This Court holds that equitable considerations retain their validity in determining whether a lease should be deemed rejected by operation of law under § 365(d)(4). *See, e.g., In re Fosko Markets, Inc.,* 74 B.R. 384 (Bankr.S.D.N.Y.1987), *In re Haute Cuisine,* 57 B.R. 200 (Bankr.M.D. Fl.1986). Having promised to provide the information necessary to resolve the rent dispute, the Court finds the Partnership's subsequent change of position without notice to Pier 5 operates to estop the Partnership from asserting the forfeiture of § 365(d)(4). Therefore, this Court holds that the lease is not deemed rejected and may be assumed by the Chapter 7 Trustee within 60 days of this ruling.

■ Furthermore, this Court finds that the lease agreement has not been terminated by material breaches. The Partnership's failure to provide a complete restaurant as agreed, as well as its demanding and receiving rent in excess of its entitlement, materially contributed to the debtor's inability to meet its financial obligations. In addition, the Partnership's failure to provide the premises as agreed constitutes a material breach of its own, further relieving Pier 5 of its performance obligations.

In defense of this action, the Partnership has further pleaded that the parties settled their differences over the leased premises in January 1986, shortly after the restaurant opened for business. The evidence does not lend credence to the assertion that Pier 5 voluntarily relinquished any particular claim for consideration. Accordingly, the Court finds that an accord and satisfaction was not effected.

Much of the confusion surrounding this dispute arises out of the Partnership's tri-

partite role as landlord, developer, and financier. The Partnership agreed to lease certain premises in return for monthly rent for a twenty-year term. The Partnership also agreed, however, to construct the leased premises. The matter is complicated further because the monthly rent, in part, consists of the debt service on the debt the Partnership incurred to develop the leased premises. The dispute centers, ultimately, on whether the property promised in the lease was provided and, if not, what effect this has on the rent.

The Court must first determine what property the Partnership promised to provide. The retail lease of January 8, 1985 describes the leased premises as:

"[A]pproximately 8850 square feet, more specifically shown on Exhibit A, attached hereto and considered a part hereof, in the building to be constructed upon the approximately 60,000 square feet of land with 170 feet of frontage on the Occoquan River as such land is described in the legal description in Exhibit B ... Landlord agrees to deliver to Tenant the Leased Premises along with the improvement and interior finishes set forth in Exhibit C hereto."

Except for the headings, Exhibits A and C are blank. Pier 5 contends, the Partnership conceded at trial, and this Court finds that the Battistone plans of October 1984, including the interior finishes thereon, were intended to be the source of exhibits A and C. The Battistone plans included the site plan, which set out the construction site. The entire project to be built on the site was a building in which the restaurant and a marina store were located. The marina store is not part of the leased premises. All parties agree that the restaurant lacked interior finishes when the Partnership turned it over to Pier 5. Thus, this Court finds that the Partnership failed to provide the leased premises as agreed.

Next, the Court must determine what constitutes the rental agreement. The January 8, 1985 retail lease and the March 12, 1985 addendum thereto comprise the written agreement. The parties agree that the rent provision in the January 8th lease was designed to meet the limitations required by the Small Business Administration, to which Pier 5 had applied for a loan, and was not intended to be binding but the remaining lease provisions would bind the parties. The January 8th lease provided for payment of rent by Pier 5 of $130,000.00 per year for each of the first three years, with increases in the fourth and each third year thereafter. In December 1984, as an alternative to a flat annual rate, Pier 5 orally offered to pay as rent the Partnership's monthly debt service on the cost of developing the restaurant portion of the project, monthly ground rent of $2,951.00, and additional annual rent of $7,500.00 per year. Although disputed by the Partnership, this Court finds that the parties also agreed in December 1984 that the cost of developing the restaurant portion of the project would be the sum of 60% of the site costs and 80% of the building costs, based on the site engineer's allocation. Pier 5 offered this alternative rent formula, as well as an additional formula based on profits, even though the formula included the possibility that the total annual rent could exceed the Small Business Administration (SBA) limit of $130,000.00 per year for the first three years. In December 1984, the Partnership agreed to accept the alternative terms proposed by Pier 5. Subsequently, Pier 5 and the Partnership executed a lease addendum on March 12, 1985 to provide for the terms of the December rent agreement. The addendum is not ambiguous but it is incomplete because it does not reflect the December proposal entirely: it omits Pier 5's responsibility for its on-site development costs and ground rent payments. Pier 5 concedes these items were intended to be included and were unintentionally omitted.

At the time the parties entered into the December oral agreement, as well as the January retail lease, the Partnership was only responsible for financing the project, not for constructing it. Pier 5 was still responsible for finding a developer who would build the project to the Battistone specifications within the financing provided by the Partnership. Both parties were

aware of the limits on financing and the source of the funds, as follows:

a. The $350,000.00 UDAG loan, which carried a 4% interest rate, payable over twenty years. The parties agreed the restaurant was to benefit from 100% of this loan. Repayments on this loan, payable quarterly, averaged $2,125.53 per month.

b. A $590,000.00 loan to the partnership from Piedmont Federal Savings & Loan Association for twenty years at a variable rate of interest. At the initial rate payable, monthly payments were $6,912.00, but were subsequently lowered.

c. The sum of $200,000.00 in capital contributions to the Partnership pledged by the general partners of the Partnership. (These contributions were never provided.)

In February 1985, Pier 5 received a bid on the project, based on the Battistone plans of October, 1984, from Thomas Siegfried on behalf of Suburban Contractors, Inc. ("the Siegfried bid"). The bid did exclude certain items contained in the Battistone plans, but the exclusions were fully disclosed. Mr. Siegfried was a general partner in the Partnership at this time. The bid, which was offered at no profit to Suburban but included a 5% contingency, was $863,432.00. Based on the Siegfried bid, the site allocations that determined costs responsibility, and the known debt service cost, Pier 5 calculated that its maximum possible rent under its proposed Addendum to the lease would be within the SBA limits. Thus, Pier 5 decided to accept the Siegfried bid and execute the proposed addendum. Before doing so however, Mr. Gilstrap of Pier 5 asked Mr. Krauss, a member of the Partnership, to review the Siegfried bid before Pier 5 accepted it. Mr. Krauss said the bid was inflated, and stated he could and would do the work for less. Mr. Gilstrap, in reliance upon these representations, accepted the Partnership's offer and executed the Addendum to Lease on March 12, 1985.[1]

Although Mr. Krauss denies the Partnership ever intended to construct the finished premises, as contemplated by the Siegfried bid, he clearly represented such when he stated he could do the job for less. Contrary to the Partnership's assertion that the parties never agreed to a limit on the cost of the project, the Partnership's agreement to develop the project as bid by Siegfried for "less" constitutes a limit on the costs chargeable to Pier 5. Thus, the Partnership as developer was promising Pier 5 to construct the Battistone plans, except for the exclusions noted in the Siegfried bid, for less than $863,432.00. The Partnership as developer failed to construct the premises as promised. Specifically, the finishes in the Battistone plans included in the Siegfried bid were not provided.

Although the Siegfried bid placed a maximum cost on the project, and Pier 5 was to pay as rent the actual debt service on its portion of the project (as well as the ground rent), a determination of this figure, with the evidence as adduced, is extremely difficult to ascertain. At least since Pier 5 commenced its occupancy of the restaurant, the Partnership's position has been that it expended in excess of the $940,000.00 in borrowed funds to complete that part of the construction for which Pier 5 was responsible. At trial, Mr. Krauss conceded that this was not true, that the Partnership had built its marina store as well out of those funds. Nevertheless, this assertion had formed the basis for the Partnership's demand to Pier 5 that it pay rent equal to the sum of the full debt service on each of the UDAG and Piedmont loans, plus the agreed ground rent, plus a $102.00 "accounting fee". Mr. Gilstrap had asked for, but never received, an accounting of the funds expended for construction of the project.

The Partnership's evidence of its alleged expenditures was confused, often contradictory, and lacks credibility. The Partnership used Prince William Marina, Inc. ("PWM") as the general contractor for the

1. Mr. Gilstrap testified that Mr. Krauss said "20% less" a figure that Mr. Krass alternately denied, was unable to recall, and "could have" said. In view of the Court's other findings and conclusions, the particular percentage is not critical. Clearly he admitted he would do the work for less.

required construction. The principals of PWM were Richard Lynn and Richard Krauss, who was also a member of the Partnership. No written bid was ever submitted for the construction, no contract for the construction was executed, and PWM was not a licensed construction contractor. The only evidence of any payment by the Partnership consists of the Partnership's checkbook and cancelled checks. Although the sum of the cancelled checks of the Partnership over the period coinciding with construction of the project is $1,196,451.00, a large number of those expenditures were not within the responsibility of Pier 5 as defined in the Addendum to Lease. For example, $329,149.00 was paid in repayment of borrowed funds and constituted capital transactions rather than construction expenditures. The sum of $28,724.00 was paid by the Partnership directly to laborers and suppliers for interior furniture, fixtures, equipment, and finishes for the marina store, none of which were provided to the restaurant side of the building. (This is in addition to the inclusion of similar items in the bills of PWM to the Partnership, which were paid by the Partnership to PWM rather than directly to the laborers and suppliers.) The amount of $14,755.00 was paid to Mr. Krauss as ground rent, all of which had been paid by Pier 5 to the Partnership and, therefore, constituted a complete pass-through. A further sum of $3,487.00 was paid for legal and accountancy fees, none of which was shown to be directly related to construction of the project.

In support of the remaining $820,336.00 in Partnership expenditures, the Partnership submitted an exhibit consisting of more than 1,000 pages of bills, invoices, and receipts for expenditures for items ranging from "fast foods" to hammers, saws, rope, and nails to a single-page bill for a $53,000.00 road. The difficulty with this submission, other than its unwieldiness, is that the evidence does not, in any meaningful way, connect it to expenditures by the Partnership or expenditures in furtherance of the project. For example, the evidence of alleged expenditure for one leg of the access road is a $53,000.00 invoice from A & J Concrete Corporation bearing the handwritten notation "Paid 4/20/84 ck No. 223". This invoice was not only not paid for by the Partnership (as is appropriate since it was not an on-site improvement) but was not even paid at all. In fact, what purported to be an invoice for $53,000.00 was false: the road was not built by A & J Concrete (as the invoice purported to show) but by Mr. Krauss, and not for $53,000.00 but for approximately $21,000.00. (Mr. Krauss' explanation was that the "price I charged the Partnership" for the road was $53,000.00 even if it had not cost that much.) This same invoice had been submitted to the Town of Occoquan in support of the UDAG loan as a "paid receipt". As previously noted, the invoices of PWM contain innumerable items directly attributable to construction of the marina store to a level far beyond that provided to the restaurant, and the PWM bills are premised upon markups in labor costs, as Mr. Krauss admitted, far in excess of any industry standard.

Part of the "construction costs" submitted by the Partnership consists of two promissory notes in the amounts of $189,682.00 and $61,500.00. These purported to be for PWM's "overhead and profit" at 21% and for the Partnership's construction period ground rent payments to Mr. Krauss, respectively. This evidence is flawed and will not be considered by the Court for each of three reasons. First, there is no evidence that the overhead, profit or ground lease payments from the Partnership to Mr. Krauss were to be within Pier 5's responsibility. Indeed, with respect to the last of these, the evidence is that Pier 5 was to (and did) commence paying, as part of its rent, a factor for ground rent only after the restaurant was ready for operation, not during the construction period. With respect to the overhead and profit factor, the parties never contemplated that Pier 5 would be responsible for such expenses, a fact made abundantly clear by the statements of Mr. Krauss in February 1985 that he could build this project for less than Mr. Siegfried (whose bid included no overhead and

profit, apparently due to the fact that he, like Mr. Krauss, was then a member of the Partnership). Second, this alleged indebtedness of the Partnership to its partner and to an affiliated corporation is not structured in such a way as to incorporate it into the formula used in the Addendum to Lease. There is no periodic payment of these demand notes necessary to keep them current. Third, it was clear from the testimony that neither the Partnership nor PWM contemplated any repayment of either of these notes unless and until the Partnership ultimately made a profit—an eventuality at best speculative given the nature of the financial arrangements. Although the notes are dated January 1, 1986 and April 1, 1986, they were not prepared until December 1986, after Pier 5 had demanded (and been promised) substantiation for all of the construction expenditures. (In contrast, the Partnership had stated, in a written submission in support of a draw against the UDAG loan, that it had "paid" the sums represented by these notes.)

The Court finds that the more reliable evidence is that of James Jensen, Pier 5's expert construction cost estimator. Mr. Jensen, on the basis of his review of the Battistone plans, a visit to the site, an examination of the building, his use of standard source and reference materials, and his expertise estimated that the total costs of the site and building construction shown on the Battistone plans would have been $797,473.00, which consists of $102,436.00 for site costs and $695,037.00 for building costs. This estimate is corroborated by Mr. Siegfried's February 1985 bid of $863,432.00, which Mr. Krauss had described as "inflated". Mr. Jensen also estimated the site and building costs as actually received by Pier 5 at $643,528.00, broken into $102,436.00 for site costs and $541,092.00 for building costs. Thus, based on the two Jensen bids, Pier 5 received 100% of its expected site improvements ($102,436.00/$102,436.00) and 77.85% of its expected building construction ($541,092.00/$695,037.00).

Although certain architectural changes came about during construction that altered the gross floor area attributable to the restaurant, the Court is not convinced these changes were unilaterally effected by the partnership or created any detriment to the debtor. Thus, the Court considers the original agreement to pay 60% of the site improvement costs to be appropriate as well as 80% of building construction costs. Pier 5 initially expected to pay, as part of its maximum possible rent, the debt service calculated on the Siegfried bid of $863,432.00, broken into $97,930.35 for site costs and $765,501.00 for building costs. Thus, Pier 5 expected to pay no more than the debt service on 60% of $97,930.35 ($58,758.21) for site costs and 80% of $765,501.65 ($612,401.32) for building costs, for a total cost of $671,159.53. As calculated by the Jensen bid, Pier 5 received 100% of its site expectation. Using the Siegfried bid, Pier 5 therefore should be responsible for debt service on $58,758.21 in site costs. Additionally, because under the Jensen bid Pier 5 received only 77.85% of its expected building construction, Pier 5 is responsible for 77.85% of $612,401.32, which is $476,754.42. Thus, the total cost on which Pier 5 is responsible for debt service is $535,512.63 ($58,758.21 plus $476,754.42).

Because the parties agree that 100% of the $350,000.00 UDAG loan benefits Pier 5, the remaining $185,512.63 is attributable to the $590,000.00 Piedmont Federal Loan. Expressed as a percentage, Pier 5 is responsible for the debt service on 31.443% of the Piedmont Federal loan ($185,512.63/$590,000.00). Thus, the monthly base rent established by the December agreement and the March addendum is the monthly ground lease payment ($2,951.00) plus 31.334% of the (variable) debt service on the Piedmont Federal loan. Pier 5 also is responsible for the $6,376.59 quarterly payment on the $350,000.00 UDAG loan. Because the rent payment based on the value of premises received already reflects any inadequacies of performance by the Partnership as developer, the remaining rent terms shall stand as agreed in the addendum, including the $7,500.00 per year addition, as well as the rent formula based on profits.

An appropriate order shall issue.