**In re METRO TRANSPORTATION CO.,
t/a Yellow Cab Co., Debtor.**

**Bankruptcy No. 86–03618S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 10, 1988.

Barry D. Kleban, Kevin D. Walsh, Phila-
delphia, Pa., for debtor.

George E. Pierce, Jr., Philadelphia, Pa.,
for First Fidelity Bank.

Mary F. Walrath, Philadelphia, Pa., for Creditors' Committee.

Rand Spear, Philadelphia, Pa., for Yellow Cab Owners and Drivers Ass'n.

Melvin T. Sharpe, Jr., Philadelphia, Pa., for Committee of Concerned Taxi Drivers/Owners.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge:

 Before us are motions of the Debtor to reject two alleged executory contracts, pre-petition agreements of the Debtor (1) with the Yellow Cab Owners and Drivers Association (hereinafter "the Association") on April 16, 1986 (hereinafter "the April Agreement"); and (2) with a splinter group of the Association, the Committee of Concerned Taxi Drivers/Owners (hereinafter "the Committee"), on June 13, 1986 (hereinafter "the June Agreement"). We believe that both the April Agreement and the June Agreement were unmistakeably executory contracts at the crucial date of the filing of the Debtor's bankruptcy petition. We hold that a formal assumption of an executory contract by a debtor is required to render an executory contract enforceable against a debtor. Hence, while no act that has been done pursuant to these Agreements will be undone, the Debtor therefore has a right to reject them and eliminate any future obligations pursuant to them. We also believe that it is certainly within the realm of the Debtor's proper business judgment to reject them. However, we are concerned with protection of the rights of the Debtor's drivers. Therefore, we condition our order granting the Debtor's motions upon an assurance that all future dealings between the Debtor and its drivers will occur only after notice to the drivers and an opportunity for them to have a hearing on any motion dealing with their welfare in our court.

The Debtor, having filed its voluntary Chapter 11 bankruptcy case on July 29, 1986, filed the motions before us on March 21, 1988. The Association and the Committee each filed answers opposing the Debtor's efforts to reject their respective Agreements. A hearing on the motions was conducted on April 26, 1988. At the hearing, counsel for several of the Debtor's secured lenders and the Official Committee of Unsecured Creditors of the Debtor appeared and supported the motions. Counsel for the Pennsylvania Public Utility Commission (PUC), Alan Kohler, Esquire, was called as a witness by the Debtor, the Association, and the Committee. Also testifying were Robert Seaner, the Debtor's Vice-President in charge of operations, and Meldorn Shamlin and Roger Pittman, presidents of the Committee and the Association, respectively.

At the close of the hearing, we established a briefing schedule requiring the parties to submit Briefs on or before May 16, 1988, and May 23, 1988, respectively. We have all of these submissions on hand and we write in narrative form, as the matters before us are motions. *See In re Campfire Shop, Inc.,* 71 B.R. 521, 524–25 (Bankr.E.D.Pa.1987).

The April Agreement is a comprehensive, detailed contract, containing 58 pages and 17 exhibits, entered into by the Trial Staff of the PUC, the Debtor, and the Association. This Agreement resolved an investigation begun by the PUC in 1981 regarding a disagreement between certain taxi drivers and the Debtor regarding the Debtor's allegedly unconscionable administration of a program to sell a large number (up to 300) of its approximately 800 Certificates of Public Convenience to its drivers. Among the multifarious terms of the April Agreement were the Debtor's agreement to sell 99 certificates to Association members at $17,000 apiece; to make certain loans and grants relating to members' vehicles, insurance, vehicle preparation, radios, and advertising; and providing an option to purchase the 26th Street garage utilized by Association members. The Association members were obliged to make payments into an escrow fund for 48 months, the total sum of which could have approached $2 million.

On July 24, 1986, just five days before the Debtor's filing, the April Agreement

was approved by a PUC Order. The PUC proceeded to approve transfers of certificates pursuant to the April Agreement to about ninety (90%) percent of the eligible Association members subsequent to the bankruptcy filing.

The June Agreement is a relatively brief three-page contract between the Debtor and the Committee which is basically a supplement to the April Agreement which clarifies certain terms of the Debtor's dealings with the Committee members under the April Agreement. Therein, the Debtor agreed to transfer 20 certificates to Committee members without further payment and 15 certificates upon payment of $12,-000 a piece, subject to the interests of lenders having security in the certificates. Although the June Agreement was not approved by a PUC order, Mr. Kohler testified that, apparently about the time of the Debtor's bankruptcy filing, the PUC "recognized" the June Agreement "as an exercise of rights" by the Committee members under the April Agreement by means of a "secretarial letter." Transcript of Recorded Proceedings, April 26, 1988, at 151.

We note that, despite the PUC's approval of both Agreements, Mr. Kohler stated that the PUC would not view any actions taken by this court concerning them as conflicting with PUC orders, since it believed that the Debtor's rights to assume or reject these Agreements were decisions within the jurisdiction of this court to which the PUC must adhere. We are therefore not faced with a conflict over powers of this court vis-a-vis the PUC's orders, as In re Metro Transportation Co., 64 B.R. 968 (Bankr.E.D.Pa.1986).

The instant proceedings were not the first litigation concerning the parties' rights under these Agreements in this case. Specifically, on September 17, 1986, the Committee filed an adversary proceeding seeking a declaration of the validity of the June Agreement and enforcement of its terms, at Adversary No. 86–1059S. After a hearing on May 26, 1987, we issued an Order of May 27, 1987, granting the Debtor's motion to dismiss the proceeding pursuant to Bankruptcy Rule 7041 and Civil Procedure 41(b), which was not appealed.

We explained our brief Order of May 27, 1987, by stating that we found the June Agreement to be an executory contract, which would allow the Committee to proceed only under 11 U.S.C. § 365(d)(2) or 11 U.S.C. § 362(d) to obtain relief. However, we found that the Committee had not met its burden of proof under § 362(d), and had not requested relief under § 365(d)(2). In the intervening year since this decision, which put the Committee on notice as to this court's assessment of its rights, no motion under § 365(d)(2) had been filed by the Committee.

The substance of Mr. Seaner's testimony was an attempt to establish that the Agreements imposed an insurmountable financial burden upon the Debtor were the Association and the Committee to attempt to enforce all aspects of the Agreements. On cross-examination, the Association's counsel attempted to establish that many of the obligations recorded by Mr. Seaner were illusory as a result of subsequent events and that the Debtor would benefit from receipt of the funds which would be paid to it under the escrow agreement.

The thrust of Mr. Shamlin's testimony was that reliance upon the June Agreement was necessary for many Committee members to remain in business. His emotionally-moving testimony bespoke of a long period of frustration with broken promises of the Debtor and hence a desire to require the Debtor to adhere to the Agreement reached only after extended negotiations in June.

Mr. Pittman expressed concern about the possible abrogation of certain aspects of the April Agreement. He expressed particular concern about the status of the 26th Street garage, which it was subsequently learned belonged to Sidney Somerman, one of the owners of the Debtor and not the Debtor itself, as the parties to the Agreement had assumed. However, his greatest concern was that the Debtor would resort to the hardnosed tactics to repossess certificates in which it had allegedly engaged prior to the execution of the Agreement.

Both the Association and the Committee argued that the Agreements are not executory contracts. Somewhat at cross-purposes, the Association emphasized that the Debtor had substantially performed all of its relevant obligations, while the Committee emphasized its members' performance of their relevant obligations and the Debtor's failures to perform. Assuming *arguendo* that the Agreements were executory, the Association, again in contrast with the Committee's position, argued that the Debtor's substantial performance to date constituted an implicit assumption of the April Agreement. The Committee, meanwhile, emphasized its substantial performance, which it argued renders it inequitable to allow the Debtor to reject the Agreements at this juncture. Finally, both argued that the Debtor had failed to satisfy the "business judgment" test for determining whether this court should allow the Debtor to reject the contracts under § 365, again for different reasons. The Association emphasized the benefit to the Debtor from receipt of the potential $2 million flowing to it under the escrow agreement which the Debtor would allegedly irrationally eschew by rejecting the April Agreement. The Committee, meanwhile, emphasized the gross unfairness and inequities which would result to its members from allowing the Debtor to reject the Agreements.

At the outset, we observe that the June Agreement is, as Mr. Kohler described it, merely a contract which clarifies the rights of certain parties also covered by the April Agreement. Thus, the Committee's position places the status of both the April Agreement and the June Agreement in issue. It was also true that the status of both the April Agreement and the June Agreement were placed in issue in the litigation of Adversary No. 86–1059S. Our unappealed decision of May 27, 1987, certainly appears to collaterally estop the Committee from arguing that the June Agreement is not executory. Moreover, since the April Agreement was also in issue

in Adversary No. 86–1059S, our Order may have collaterally estopped both the Association and the Committee from arguing that either the April Agreement or the June Agreement are not executory. *See Arizona v. California*, 460 U.S. 605, 618–28, 103 S.Ct. 1382, 1391–96, 75 L.Ed.2d 318 (1983); *In re Ross*, 602 F.2d 604, 608 (3d Cir.1979); and *In re Butler, Howkins v. Butler*, 86 B.R. 829, 831–33 (Bankr.E.D.Pa.1988).[1]

However, putting aside our Order of May 27, 1987, we have no doubt that the Agreements in issue were, when written, executory contracts under any definition of the term. Certainly, they were contracts which contemplated considerable future performances from all parties thereto. *See In re W. & L. Associates*, 71 B.R. 962, 965 (Bankr.E.D.Pa.1987); 2 COLLIER ON BANKRUPTCY, ¶ 365.02, at 365–13 (15th ed. 1987); and V. Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN.L.REV. 439, 450–62 (1973).

Clearly, it was also true that, at the crucial date of the filing of the petition, additional performance was required from the Debtor, the Association and the Committee Members, and the PUC to consummate all aspects of the Agreements. As we held in *W. & L., supra*, 71 B.R. at 965, where further performance is required by the debtor and substantial performance is required from any party to an agreement at the time of a bankruptcy filing, the agreement is an executory contract which is subject to being assumed or rejected by the debtor in the course of its bankruptcy. *But see In re Cherry*, 78 B.R. 65, 68–69 (Bankr.E.D.Pa.1987) (an agreement terminated prior to the filing is not an executory contract which may be assumed or rejected by a debtor). However, no matter what definition of "executory contract" is utilized by us here, there is no question that, here, substantial performance on the part of all three parties to the Agreement was envisioned to occur after the bankruptcy filing. Therefore, it is clear that both Agreements are, by any definition of term,

---

1. Whether the Agreements in issue are executory are the same issues as were presented in Adversary No. 86–1059. These issues were litigated. They were determined in our Order. Determinations of these issues were necessary to our previous disposition.

"executory contracts" which the Debtor has the right to assume or reject.

We do not view our decision in *In re Fox*, 83 B.R. 290, 294–95 (Bankr.E.D.Pa.1988), issued subsequently to the *W. & L.* decision and cited by the Committee, as minimizing the power of a debtor to assume or reject a contract, but rather as a further statement of the strength of that power. There, we emphasized that we were inclined to interpret § 365 broadly in a debtor's behalf, *id.* at 295, 298–99, and give the Debtor the option to treat an installment land sale contract as a purchase-money mortgage rather than treating it as an executory contract. *Id.* at 302. Here, like there, we emphasize the power of a debtor to choose to utilize § 365 wherever and however it deems it appropriate to do so.

■ The Association and the Committee display a misunderstanding of the mechanics of § 365 when they argue that conduct of the Debtor which clearly was post-petition is relevant in considering whether the agreements are executory contracts. Again, we emphasize that it was the status of the Agreements as of the date of the Debtor's filing on July 29, 1986, which measured whether the Agreements were executory contracts or not. Post-petition conduct is only relevant to the argument, such as it is, that the Debtor has implicitly assumed the Agreements by its post-petition conduct.

■ With a caveat, we are inclined to give short shrift to the argument that a debtor, over its protestations, can be held to have assumed a contract by certain post-petition conduct, which conduct is short of a formal motion of a debtor seeking to assume the said executory contract. We totally agree with the reasoning of *In re Whitcomb & Keller Mortgage Co.*, 715 F.2d 375, 378–80 (7th Cir.1983); and *In re Speed Fab–Crete of Nevada*, 57 B.R. 720, 723–24 (Bankr.D.Nev.1986), which conclude that a debtor may not be estopped from rejecting a contract by postpetition conduct consistent with its assumption. *Cf. In re New York City Shoes, Inc., Richard Royce Collections, Ltd. v. New York City Shoes, Inc.*, 84 B.R. 947, 960–961 (Bankr.E.D.Pa.

1988) (court refuses to recognize an implicit rejection of an executory contract in any circumstances). We find a great distinction between an attempt to effect an implicit rejection or assumption of an executory contract upon a resistant debtor, as is in issue here, and other somewhat analogous sets of circumstances.

One analogous circumstance arose in *In re Reda, Inc.*, 54 B.R. 871, 880 (Bankr.N.D. Ill.1985), where the court found the debtor, having no apparent stake in the issue, had implicitly assumed a contract in resolving a dispute between non-debtor parties. Another analogous circumstance is presented in attempts by a debtor to inpute its assumption of an executory contract against a non-debtor as a result of the non-debtor's affirmative response to a debtor's actions consistent with assumption. *See In re Pier 5 Management Corp.*, 83 B.R. 392, 393–94 (Bankr.E.D.Va.1988) (landlord estopped from contesting belated motion to assume lease by its refusal to supply information necessary to calculate rent); *In re Ranch House of Orange–Brevard, Inc.*, 78 B.R. 323, 326 27 (Bankr.M.D.Fla.1987) (landlord waives right to contest debtor's belated assumption of lease by accepting rent); and *In re Aneiro*, 72 B.R. 424, 427–28 (Bankr.S.D.Cal.1987) (debtor can assume lease by plan provision). The caveat is that different consequences may ensue when a debtor is seeking to contend that conduct of a creditor as effects an assumption or rejection of an executory contract as opposed to a third party's attempts to make such a contention against a debtor. *Compare Fox, supra*, 83 B.R. at 295, 298–99 (§ 365 interpreted broadly on debtor's behalf). Rarely, if ever, will we estop a debtor from formally assuming or rejecting an executory contract by reason of mere post-petition conduct which is allegedly inconsistent with the assumption or rejection ultimately requested.

■ We recognize that assumption or rejection of an executory contrary requires an all-or-nothing commitment going forward, and that hence a debtor cannot assume part of an executory contract in the future while rejecting another part. *See,*

e.g., *Fox, supra,* 83 B.R. at 295–96, 299; and *In re Silver,* 26 B.R. 526, 529 (Bankr. E.D.Pa.1983). Also, we note that rejection of an executory contract does not effect a rescission of such a contract. *See, e.g., In re Rudaw/Empirical Software Products, Ltd.,* 83 B.R. 241, 246 (Bank.S.D.N.Y.1988); and *In re Executive Technology Data Systems, Inc.,* 79 B.R. 276, 282 (Bankr.E.D. Mich.1987). Hence, rejection does not undo performances by the parties to the contract, either pre-petition or post-petition, which have preceeded the assumption or rejection. Consequently, performances completed by the Debtor or by the other parties pursuant to the Agreements in.issue are not affected by the Debtor's instant motions. To the response of the Association and Committee members that they would not have performed to the extent that they did had they known of the Debtor's rejection, we can only respond that it is the function of § 365(d)(2) to allow a party to an executory contract to flush a commitment out of a debtor as to assumption or rejection. The Association and the Committee apparently disregarded the advice contained in our Order of May 27, 1987, suggesting that they take advantage of that remedy.

■ The final issue is whether the Debtor's attempted rejection meets the standards of the "business judgment test", an issue which we also addressed at some length in *W. & L., supra,* 71 B.R. at 966–67. We reiterate that the "business judgment test" is not a "strict standard to meet." *Id.* at 966. *See, e.g., In re Bildisco,* 682 F.2d 72, 79 (3d Cir.1982), *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Contrary to the Association's suggestions, it is apparent that the debtor does not perceive the prospect of receipt of its members' payments approaching $2 million to be a sufficient incentive to assume the April Agreement. Supported as the Debt-

or is in its position by the Creditors' Committee and the secured lenders, we could hardly conclude that it is unlikely that rejection of these agreements would benefit the debtor. *Compare In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 390, 395–96 (Bankr.E.D.Pa.1987) (debtor's proposed settlement with one creditor approved because it did not fall below the "lowest point in the range of reasonableness," despite opposition from the Creditors' Committee and all creditor groups). It is apparent that the debtor, not without reason, concludes that it will gain more from elimination of its burdens to the Association and be able to sell its remaining certificates for greater amounts than the $17,000 price set forth in the Agreement. This conclusion appears to be a sound exercise of business judgment.

In one sense, the Committee's argument that rejection of the June Agreement is unconscionably detrimental to it (and, correspondingly, unfairly beneficial to the Debtor) seals the Debtor's case that rejection of the Agreements is a wise business judgment. *Compare W. & L., supra,* 71 B.R. at 966–67 (non-debtor's protestations of the unfairness of allowing a rejection as to it confirm the conclusion that the rejection is in the best interests of the debtor). However, ultimately, this argument convinces us to impose some specific restrictions on the Debtor's future dealings with its drivers to allay the fears of the members of the Association and the Committee that rejection of the Agreements will allow the Debtor to run roughshod over their rights.

It cannot be forgotten that the Agreements in issue represent contracts between the Debtor and its drivers. The testimony of Mr. Shamlin bespeaks of a long history of grievances, which have caused the drivers, who are the human heart-blood of a taxicab company, to suffer repeated frustrations.[2]

---

**2.** We note that Mr. Shamlin's testimony of precarious financial circumstances of himself and his colleagues are not fabrications. Mr. Shamlin, a family man who is often accompanied in court by his young son, is himself a debtor in a separate bankruptcy case, represented by a legal

services organization providing services to the indigent, in attempting to save his home. *See In re Shamlin,* Bankr. No. 88–10242F (Bankr.E.D. Pa., Memo filed May 24, 1988) (debtor provided brief respite in attempt to save home from loss at tax sale).

While neither the Association nor the Committee have ever contended that the Agreements in issue are collective bargaining agreements with the scope of 11 U.S.C. § 1113, and they clearly are not,[3] the agreements in issue do bear some resemblance to such agreements. They were, in effect, agreements between labor and management, by which labor was granted certain rights and concessions from management.

In *Bildisco, supra,* the Supreme Court, even though Congress had not yet spoken at all to the subject, as it later did in response to that very decision, recognized 465 U.S. at 524, 104 S.Ct. at 1195, that

> because of the special nature of a collective-bargaining contract, and the consequent "law of the shop" which it creates, see *John Wiley & Sons [v. Livingston ],* [376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) ], *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578–579 [80 S.Ct. 1347, 1350–51, 4 L.Ed.2d 1409] (1960), a somewhat stricter standard should govern the decision of the Bankruptcy Court to allow rejection of a collective-bargaining agreement.

While the Supreme Court opted for a less strict standard than the N.L.R.B. and the union urged in that case, leading to the enactment of 11 U.S.C. § 1113, it nevertheless held, *id.* 465 U.S. at 526, 104 S.Ct. at 1196,

> that the Bankruptcy Court should permit rejection of a collective-bargaining agreement under § 365(a) of the Bankruptcy Code if the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract.

We reiterate that the Agreements in issue are not collective bargaining agreements, nor are they subject to the National Labor Relations Act, the jurisdiction over which gave rise to the balancing test employed by the court in *Bildisco.* Nevertheless, we believe that the Debtor itself, as well as the Creditors' Committee and the participating lender, recognize that equitable treatment of the Debtor's drivers is important to its successful reorganization, as is maintaining good relations with its creditors and the Debtor's attempts to acquire private insurance and thus quiet the concerns of the public interest expressed by the PUC.

We also emphasize, as the Association and Committee members and their counsel seemed at times to be unable to perceive, that rejection of the Agreements as a whole by the Debtor does not preclude the Debtor from performing certain parts of the Agreements. Moreover, the Debtor may renegotiate very similar agreements with the Association and the Committee, eliminating terms which are particularly onerous to the Debtor. Whatever portions of the Agreements the parties have already consummated and performed prior to rejection are not rescinded. Parts of the Agreements which were not executory will be intact despite the rejection of the Agreements. *See Leasing Service Corp. v. First Tennessee Bank Nat'l Assn.,* 826 F.2d 434, 437 (6th Cir.1987); and *Jenson v. Continental Financial Corp.,* 591 F.2d 477, 482 (8th Cir.1979). The Debtor must compensate the contracting parties in the Agreements for the benefits which it has already obtained therefrom. *See In re Yonkers Hamilton Sanitarium, Inc.,* 22 B.R. 427, 435 (Bankr.S.D.N.Y.1982); and *In re Shoppers Paradise, Inc.,* 8 B.R. 271, 279–80 (Bankr.S.D.N.Y.1980). The Debtor's rejection is a breach of the Agreement, 11 U.S.

**3.** A "collective bargaining agreement" is more than a mere contract between labor and management, but is, rather, "the paradigmatic labor contract, covering a wide array of contingences that..., arise in [an] employment relationship," constituting a "generalized code [that] covers the whole relationship" and featuring a grievance machinery that is said to be the "very heart" of such an agreement. *Greismann v.*

*Chemical Leaman Tank Lines, Inc.,* 776 F.2d 66, 71 (3d Cir.1985), quoting in part *United Steelworkers v. Warrior Gulf, infra,* 363 U.S. at 578–81, 80 S.Ct. at 1350–52. The April Agreement, though comprehensive, does not purport to be a code controlling the entire relationship between the parties. Clearly, the June Agreement, only addressing one issue of the parties' relationship, does not satisfy this definition.

C. § 365(g), rendering it liable to the Association and Committee members for damages arising therefrom.

We conclude that the Debtor is entitled to reject both of these Agreements. However, we note our concern that the drivers who make up a significant portion of the Debtor's labor force must be assured that they will have a forum in this court to protect them against inequitable treatment at the hands of the Debtor. We encourage the Debtor to renegotiate agreements with the drivers which will omit only those portions which are truly burdensome to the Debtor. However, we believe that some expression of checks upon the Debtor is necessary in the event that it fails to do so.

Therefore, we shall, as a condition of allowing the Debtor to reject these agreements, order that no transfers of certificates or any other specific actions which would deprive any driver of any rights within the scope of the Agreements can be effected without approval of this Court after notice and an opportunity for a hearing in which the Association, the Committee, and the particular driver affected will be entitled to participate. Although 11 U.S.C. § 363(b) may already require such a motion as to any transfers of certificates, since such transfers would not appear to be in the ordinary course of the Debtor's business, we will nevertheless be thereby assured of having such a matter come before us. We believe that, in this way, we can provide the careful scrutiny of the Debtor's relationship with its drivers which we believe that the circumstances require.

An Order consistent with the conclusions expressed in this Opinion will be entered.

### ORDER

AND NOW, this 10th day of June, 1988, after a hearing of April 26, 1988, on the Motions of the Debtor to Reject Executory Contracts with the Yellow Cab Owners and Drivers Association (hereinafter "the Association") and the Committee of Concerned Taxi Owners/Drivers (hereinafter "the Committee"), it is hereby ORDERED and DECREED as follows:

1. The Motions are GRANTED, and the Agreements of April 16, 1986, and June 13, 1986, are hereby deemed REJECTED, subject to the qualifications and conditions set forth in the foregoing Opinion and paragraph two hereof.

2. Prior to making any future disposition of its Certificates of Public Convenience or making any disposition of vehicles, insurances, radios, the garage at 26th Street in Philadelphia, or any other matters which are the subject of the rejected Agreements of April 16, 1986, and June 13, 1986, in issue, the Debtor shall receive approval after notice to all interested parties, including any driver affected and counsel for the Association and the Committee, and an opportunity for said parties to have a hearing on the matter in issue in this court.