**In re SPEED FAB–CRETE OF NEVADA, a Nevada Corporation, also doing business as Precon, Debtor.**

**Bankruptcy No. 83–1032.**

United States Bankruptcy Court, D. Nevada.

Feb. 18, 1986.

Stephen R. Harris, Belding & Harris, Reno, Nev., for debtor.

Hefner, Stark & Marois, Sacramento, Cal., for Kimmel Const.

## MEMORANDUM DECISION and ORDER

JAMES H. THOMPSON, Bankruptcy Judge.

The matter before the Court is the Motion of Kimmel Construction, Inc. (Kimmel) for an order allowing administrative claim pursuant to Bankruptcy Code § 503(b). A final hearing on the merits was conducted on November 19, 1985, and the issues submitted to the Court for decision. For the reasons set forth below, Kimmel's Motion is denied.

### I

The debtor (Speed Fab) filed on December 30, 1983, its petition under Chapter 11 of Title 11 U.S.C. Speed Fab was in the business of fabricating and erecting pre-stressed concrete beams and slabs. Prior to filing the petition Speed Fab was under contract with Kimmel to supply and erect concrete panels on a construction site where Kimmel was a subcontractor. Speed Fab continued to perform after filing the petition by delivering and erecting panels until it abandoned the contract work on March 27, 1984.

Kimmel contends that Speed Fab's continuing performance after filing of the petition constituted an assumption of the contract which can be "legally recognized" and "approved" by this court. Kimmel further argues that since debtor assumed the contract and later rejected it by abandoning the work, that Kimmel has incurred post-petition damages which should be allowed as an administrative claim under § 503(b).

The trustee and an unsecured creditor argue that the court never gave its specific approval to an assumption of the executory contract as required by § 365(a), and therefore, there can be no postpetition breach of a contract not assumed with court approval. Hence, Kimmel's damages, if any, would be prepetition as to which it would be an unsecured creditor. See Bankruptcy Code [11 U.S.C.] § 365(g)(1) and § 502(g).

### II

Kimmel argues that § 365(a) does not apply because Speed Fab was a debtor-in-possession under § 1108 and its continued performance was an assumption of a contract and an act in an ordinary course of its business. Kimmel relies on *In re Ridgewood Sacramento, Inc.*, 20 B.R. 443 (Bankr.E.D.Cal.1982). There the debtor accepted a second shipment of goods from the creditor pursuant to an executory contract. These goods enabled the debtor to continue operating its business and tended to preserve the estate. *Ridgewood* held since the debtor had, pursuant to § 1107 the power of a trustee under § 365(a), that the debtor was permitted to assume the executory contract as an act in the ordinary course of its business under § 1108. However, *Ridgewood* erroneously proceeds

upon the premise that a debtor is in the business of assuming executory contracts. *Ridgewood* further ignores the clearly expressed duty of a trustee or D.I.P. to obtain specific court approval under § 365(a). See *Matter of Whitcomb & Keller Mortgage Co.*, 715 F.2d 375 (7th Cir.1983). To hold that operating the business is equivalent to assumption of all contracts incident to the operation would be to deny a Chapter 11 debtor the flexibility it was intended to have by Bankruptcy Code § 365(d)(2). Although it is correct that the debtor has the authority to continue operating the business without court approval after filing the petition, the Chapter 11 debtor also has until the confirmation of a plan to decide whether or not to assume or reject executory contracts. Operating the business maintains the status quo, while the assumption of an executory contract binds the reorganized debtor in the future and creates new administrative obligations. *In re Marple Publishing Co., Inc.*, 20 B.R. 933, 935 (Bankr.E.D.Pa.1982). It is the debtor's reorganization plan—not merely the continued operation of the business— which is the expression of the debtor's future intentions regarding the business. Sections 365(a) and 365(d)(2) would be for most purposes meaningless if the court were to interpret § 1108 as Kimmel suggests.

Assuming, *arguendo*, *Ridgewood's* expansive reading of § 1108 is correct,[1] the facts preclude its application here. In *Ridgewood*, the debtor not only received the mill work but had also received payment for the mill work by its sub-purchaser. Clearly, the estate was not only preserved but also increased by the creditor's postpetition performance and the claim was entitled to be treated as an expense of administration under § 503. The result in *Ridgewood* is correct but could have been reached without analysis of assumption or not of an executory contract. The debt arose postpetition by the use of goods to continue operation of debtor's business.

In the present matter, the parties' positions are reversed. Here, it is the debtor, Speed Fab, which supplied material and labor to Kimmel, who then made progress payments to the debtor, less a sum retained as a retent. Certainly the estate cannot be said to have been preserved or enhanced within the intent of § 503. Therefore, in a non-*Ridgewood* factual setting, as here, the court must be guided by the requirements of § 365(a).

### III

Congress provided in the 1978 Bankruptcy Code, § 365(a), that the assumption of an executory contract by the trustee is "subject to the court's approval." Congress repealed § 70(b) of the former Bankruptcy Act under which a split of authority had developed as to whether an assumption of an executory contract required formal court approval, instead of inferring an assumption from the conduct of the trustee. See *In re By-Rite Distributing, Inc.*, 47 B.R. 660, 665 (Bankr.D.Utah 1985). As Judge Lundin noted in *In re Kelly Lyn Franchise Co.*, 26 B.R. 441, 444 (Bankr.M. D.Tenn.1983), even under the Act, the majority rule, and the better rule, required prior judicial approval before allowing an assumption.

Kimmel cites two Ninth Circuit Court of Appeals decisions in support of its contention that formal prior court approval is not required: *Local Joint Executive Board v. Hotel Circle, Inc.*, 613 F.2d 210 (9th Cir. 1980) and *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir.1981). *Hotel Circle* construed § 70(b) and § 313(1) of the former Act as they related to the assumption of a collective bargaining agreement under the National Labor Relations Act. The court held a receiver could not assume such a labor agreement by conforming to its terms. But in *Huntington* the Ninth Circuit clear-

---

1. *Ridgewood's* conclusion that the acceptance of postpetition delivery was an assumption by conduct relied on cases decided under the Act which are no longer applicable: *In re Steelship* *Corp.*, 576 F.2d 128 (8th Cir.1978); *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998 (3rd Cir.1973); *In re Huntington Ltd.*, 654 F.2d 578 (9th Cir.1981). See discussion following.

ly limited the holding of *Hotel Circle* to collective bargaining agreements only, holding that in some circumstances a receiver might assume a non-labor executory contract by actions constituting a clear manifestation of an intent to assume. Thus, *Huntington* held that a debtor could assume an executory contract by conduct, subject only to later court approval. Again, *Huntington* construed provisions of the former Act and both it and *Hotel Circle* are not dispositive of a case arising under § 365 of the 1978 Code.

■ The cases which have considered the application of § 365(a) to an executory contract or lease have consistently decided that § 365(a) means what it says, i.e., an express order of the judge approving an assumption or rejection is required. See *In re Marple Publishing Co., supra; In re Price Chopper Supermarkets, Inc.*, 19 B.R. 462 (1982) and cases cited therein; *In re Kelly Lyn Franchise Co., supra*, and *In re By-Rite Distributing, Inc., supra*. This Court similarly holds that § 365(a) requires specific court approval of an assumption of the executory contract which Kimmel did not obtain.

### IV

■ Kimmel argues that it was prevented from obtaining timely court approval because Speed Fab concealed from it the fact of its filing bankruptcy, and that Speed Fab should be estopped from claiming that the contract was not assumed by it.

Kimmel's employees testified that it was March 9, 1984, at the earliest, on which Kimmel learned from a third party of the bankruptcy having been filed the previous December 30th. Hempel, an employee of Kimmel, testified he came to Carson City on January 30, 1984 to meet with Speed Fab officials about progress in fabricating the panels. Hempel's written notes of the meeting did not mention anything about "bankruptcy". Mr. Chilton, President of Speed Fab, testified he was present at the January 30th meeting and stated that Hempel requested the meeting because Speed

Fab had complained two weeks before of late payments from Kimmel. Chilton recalled vague questioning from Hempel on how Speed Fab would be able to operate "under our financial condition, but we made no direct response to Chapter 11 on advise of our attorney." On February 21st the first panels were delivered to the job site. On February 28th a third party, another subcontractor on the site, telephoned Hempel telling him of the bankruptcy and wanted to know what Kimmel was going to do to protect the subcontractors.

Chilton testified there were two meetings after the January 30th meeting in Jack Kimmel's office to determine "if we had the money to finish the job. Jack Kimmel was there." On cross-examination regarding the last meeting on March 9th, Chilton testified that Jack Kimmel had asked about the bankruptcy two weeks before.

The court concludes from the foregoing that as early as January 30, 1984, one month after filing of the bankruptcy, Kimmel was apprehensive about Speed Fab's financial ability to perform and should have been on notice to inquire further about its financial status. Indeed, the subject of bankruptcy must have been broached by Hempel at the January 30th meeting because Chilton testified that they did not respond to it on advise of their attorney. Kimmel made no further investigation, and only after being told by the third party on February 28th of the bankruptcy was that information relayed to Kimmel's corporate legal staff.

Furthermore, it does not appear that there was any prejudice to Kimmel by not learning of the bankruptcy immediately upon filing. A party to a contract with a debtor must perform until the contract is rejected; that party has no right unilaterally to stop performance. *See Whitcomb, supra.* In a Chapter 11 context, the party may move the court to fix a time for assumption or rejection sooner than the time of the plan confirmation. Code § 365(d)(2). This is committed to the court's discretion. *See Whitcomb, supra,* at 379. In order to make out a claim of estoppel, Kimmel

would have to demonstrate to this court that it suffered an injury caused by the debtor's failure to notify it timely of the bankruptcy filing. Here, it is entirely speculative and improbable that if Kimmel had known of the bankruptcy earlier he would have applied for and obtained a court order requiring the debtor to assume or reject before the time the debtor walked off the job, and that somehow this would have prevented the loss and damages now claimed by Kimmel to be administrative expense.

Kimmel's argument is similar to that made by the creditor in *Whitcomb*, to the effect that it is unjust for a debtor to receive the benefits of a contract without assuming its burdens. It is true that the debtor cannot accept one part of a contract and reject the unfavorable parts, but until the debtor decides whether or not to accept the contract, the debtor may expect performance from the other party. As *Whitcomb, supra*, indicated, this is what the Code contemplates—the maintenance of the status quo until the decision is made. Kimmel argues that it "enriched" the estate by over $200,000, but use of this term is misleading: the debtor was simply paid for services already performed. Kimmel received the benefit of its bargain and was obligated to make this payment. Earlier knowledge of the bankruptcy filing would not have made any difference in Kimmel's obligation to pay for services rendered by the debtor. Therefore, insofar as Kimmel's claim is for damages for rejection of an executory contract, Kimmel is not entitled to administrative priority. Accordingly,

IT IS HEREBY ORDERED that Kimmel's Motion is DENIED.