In re ST. MARY HOSPITAL, Debtor.

Roger B. HISER, Trustee in
Bankruptcy, Plaintiff,

v.

BLUE CROSS OF GREATER PHILA-
DELPHIA, Otis R. Bowen, M.D., Secre-
tary of Health and Human Services,
Defendants.

Bankruptcy No. 88–11421S.
Adv. No. 88–0836S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 12, 1988.

As Amended Aug. 23, 1988.

Marc J. Sonnenfeld, Richard D. Gorelick, Morgan, Lewis & Bockius, Philadelphia, Pa., for Blue Cross.

Jim Newman, Deputy Chief Counsel, Reg. III, HHS, Philadelphia, Pa., for HHS.

Michael L. Molinaro, Katten, Muchin, Zavis & Mannino, P.C., Chicago, Ill., Thomas E. Sweeney, Chadds Ford, Pa., Jos. T. Sebastianelli, Ernest T. Tsoules, Jr., Sebastianelli Law Assoc., Paoli, Pa., for Franciscan Health Ser.

Jeffrey B. Schwartz, Mark H. Gallant, David S. Fishbone, Philadelphia, Pa., for trustee.

Roger B. Hiser, East Greenville, Pa., trustee.

Henry F. Siedzikowski, Daniel Carrigan, Jonathan Vipone, III, Baskin, Flaherty, Elliott & Mannino, P.C., Daniel E. Farmer, Harris B. Savin, Peter Rosenthal, Diamond, Polsky & Bauer, Philadelphia, Pa., for debtor.

Howard T. Glassman, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for Nurses, Inc.

504

Henry Sommer, Richard P. Weishaupt, Louis S. Rulli, Community Legal Services, Inc., Philadelphia, Pa., for Community Parties.

James J. O'Connell, Kevin Callahan, Office of U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

Bryna L. Singer, Cohen, Shapiro, Philadelphia, Pa., for Professional Health Care.

Stephen F. Gold, Philadelphia, Pa., for adversary plaintiffs.

Harold Berzow, Finkel, Goldstein & Berzow, New York City, for Hospital Supply Co.

Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa., for USA, HUD and HHS.

Charles M. Golden, Philadelphia, Pa., for Nurse Finders.

George Miller, CPA, Philadelphia, Pa., Examiner.

Seymour Kurland, City Solicitor, Richard Gold, 1st Deputy, Cynthia E. White, Chief Asst. City of Philadelphia, Philadelphia, Pa., for City of Philadelphia.

Gary M. Schildhorn, Mark J. Packel, Philadelphia, Pa., for Creditors' Comm.

Nathalie D. Martin, Dean M. Schwartz, Philadelphia, Pa., for UMEDCO.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The several matters before us in this bankruptcy case, which has been problematical ever since its filing just a little over three months ago,[1] all revolve around the right of the federal Department of Health and Human Services (hereinafter referred to as "HHS") to recoup pre-petition overpayments of Medicare reimbursements for services against post-petition Medicare advances and remittances otherwise payable to the Debtor hospital. This is an issue which has arisen in several other cases involving health providers, and the results and reasoning in the cases in this area have varied widely.

■ Resolution of such a difficult problem, which implicates various Code sections which conflict to some degree with each other, prompts us to return to basics. We believe that the two fundamental principles pervading all bankruptcy law—equality of treatment of creditors and providing a "fresh start" to a beleaguered debtor—cut strongly in the favor of the Debtor. We therefore conclude that, principally due to the impact of 11 U.S.C. § 525(a) upon this controversy, the Debtor cannot be compelled to pay pre-petition obligations to HHS as a condition for continued participation by HHS in the Medicare program at the Debtor-hospital. In so reasoning, we acknowledge adding yet another new reasoning process in this area to the analogous cases which have come before this.

The instant Chapter 11 case was filed on April 27, 1988. As our May 9, 1988, Opinion documents, a combined effort of several doctors on the Debtor's staff, the City of Philadelphia, and numerous community groups and individuals, although opposed by management and at least initially by the Official Unsecured Creditors' Committee, convinced us to halt the plans of the then-management of the hospital to close immediately, without thorough review of alternatives, the doors of an institution which was immensely popular with the low-income community which it served. Unfortunately, the actions of past management directed towards closing the facility created a severe, immediate cash-flow problem for the Trustee appointed by us to manage the Debtor.

The instant controversy was initially brought to our attention by the Trustee's filing the above-captioned Adversary proceeding on June 17, 1988. The Complaint

1. Our initial Opinion, enjoining the Debtor's plan to close the hospital immediately after the filing, is reported at 86 B.R. 393, 17 BCD 685 (Bankr.E.D.Pa. May 9, 1988). On May 13, 1988, after receiving the report of our appointed examiner so recommending, we appointed Roger B. Hiser as Trustee on May 17, 1988. Mr. Hiser has, pursuant to unrebutted testimony in this record, substantially revitalized the activities of the hospital during his tenure, although the effects of the efforts of prior management to close the hospital have significantly crippled these efforts.

recited two claims arising from the refusal of Defendant BOWEN's Health Care Financing Administration (hereinafter referred to as "HCFA") and its fiscal intermediary, Defendant Blue Cross of Greater Philadelphia (hereinafter referred to as "Blue Cross"), to continue to remit payments to the Debtor pursuant to the periodic interim payments (hereinafter "PIP") schedule that had been utilized previously: (1) A request for a turnover of payments withheld; and (2) A prayer for an injunction preventing the Defendants from effecting setoffs against the PIP payments. A preliminary injunction hearing was requested and scheduled on June 23, 1988.

On June 21, 1988, Defendant Bowen, as Secretary of HHS, filed four motions of his own seeking the following relief: (1) A declaration that the Debtor should be deemed to have implicitly assumed its allegedly executory Medicare provider contract with HHS, thereby allowing HHS to recoup overpayments pursuant to the contract terms; (2) In the alternative, an order compelling the Debtor to assume or reject the provider contract, presumably forthwith; (3) An order granting relief from the automatic stay to pursue its right of recoupment, which HHS alleged was brought in an abundance of caution despite an already-existing right to do so; and (4) An order permitting it to pay funds otherwise presently payable to the Debtor into an escrow account, pending determination of its right to recoup overpayments from same.

The hearing of June 23, 1988, focused solely on the Debtor's right to continue receiving payments pursuant to the PIP schedule after its suspension, on May 19, 1988, followed by its termination, on June 9, 1988. Required to rule immediately, we announced our intention to require the Defendants to remit payments to the Debtor pursuant to the previously-established PIP schedule, i.e., $249,691.00 bi-weekly through June 30, 1988, pending a final hearing on this Adversary proceeding and on HHS' four motions on July 20, 1988.

On June 24, 1988, we filed a brief Memorandum explicating our ruling of the previous day. We stated therein that our decision on the element of the Debtor's "reasonable probability of ultimate success" in this litigation was based on three grounds: (1) The Defendants appeared to have acted without just grounds, contrary to one regulation, 42 C.F.R. § 413.64(h)(4), and pursuant to another of doubtful enforcibility in a bankruptcy context, 42 C.F.R. § 413.64(i);[2] (2) In acting unilaterally, without according the Debtor a prior hearing, the Defendants had violated the Debtor's right to due process of law; and (3) We doubted that the Defendants' conduct could be "justified as an aspect of the assumption of an executory contract between the Debtor and Defendant Bowen" because it seemed to us that, "as in the case of a debtor-tenant of public housing attempting to avert a post-petition eviction based on a failure to pay a pre-petition rent delinquency, 'the strong public policy of 11 U.S.C. § 525(a) overrides the potential requirement of 11 U.S.C. § 365(b)(1)....' *In re Sudler*, 71 B.R. 780, 787 (Bankr.E.D.Pa.1987)". Memorandum, at 4.

The final hearing, scheduled for July 20, 1988, was continued until July 28, 1988. The parties announced, on the latter date, that they had resolved the PIP issue, by the Debtor's agreeing that this schedule could be suspended for the time being, subject to subsequent reinstitution. This resolution apparently prompted HHS to withdraw the fourth of its motions recited at page 505 *supra*, requesting that future payments be paid into an escrow account.

Hence, the remaining differences swirled solely around the Defendants' right to recoup in excess of $353,000.00 in Medicare

**2.** 42 C.F.R. § 413.64(h))4) provides that the "intermediary's best judgment" shall determine whether the PIP schedule could be used without undue risk of resulting overpayment. Stanley Kaimowitz, Blue Cross's manager, testified that he was prepared to restore the PIP schedule, but was overruled by an official of HCFA.

42 C.F.R. § 423.64(i) provides that PIP will be adjusted if bankruptcy or insolvency proceedings are or will be instituted against a provider. *See* 11 U.S.C. § 525(a) and pages 509–10 and 511–12 *infra*.

overpayments that had arisen in the Debtor's 1986 fiscal year (which ended June 30, 1986) from current advances to the Debtor. At the close of the hearing, the parties, having submitted lengthy Briefs prior to the June 23, 1988, hearing, and prior to this hearing, presented spirited oral argument and then agreed to submit the matter to us for disposition without further briefing.[3]

Several significant facts were developed at the hearing. First, HHS relied, as the contractual basis for its right of recoupment, upon a Health Insurance Benefits Agreement which its records showed that the Debtor had executed on May 5, 1966, but which it could not locate. Instead, it provided a facsimile copy of the contract form which it contended must have been executed by the Debtor on that date.

Secondly, on September 8, 1987, HHS accepted a new Health Insurance Benefit Agreement from the Debtor. A HCFA official claimed that the 1987 Agreement was required solely to alert providers to certain obligations appended in 1986 legislation, was totally insignificant, and that the 1966 Agreement was therefore the document under which it considered the parties to be proceeding at all times.

Thirdly, during the Debtor's 1987 fiscal year, HHS agreed that it had underpaid the Debtor by at least $77,518.00 (the Debtor claimed that it was owed over $500,000.00), and it had remitted that sum to the Debtor.

Finally, it was noted that the Commonwealth of Pennsylvania, in administering the Medicaid program, had agreed not to seek any recoupments at all against the Debtor at this time. In fact, the Commonwealth had recently remitted $320,000.00 to the Debtor from sums owed from the 1985 fiscal year.

At the close of the hearing, the Debtor articulated a fall-back position. Assuming *arguendo* that this Court held that it must assume its provider agreement with HHS and allow HHS to effect recoupment from present payments to continue receiving Medicare payments, the date for requiring it to assume or reject this contract should be postponed until the date of confirmation of the Plan of Reorganization in the case. Although the Debtor conceded that Medicare payments, like Medicaid payments, constituted forty (40%) percent of its income at present, and hence that at present, continued participation in the program was anticipated, its chief fiscal officer indicated that alternative uses of the facility were being explored which might preclude any dependence on Medicare reimbursement in the future. The request that we so rule on HHS' § 365(d)(2) motion was warmly endorsed by the Creditors' Committee.

There is no dispute that the pertinent portions of the federal Social Security Act not only permit, but mandate, that Defendant BOWEN make "necessary adjustments on account of previously made overpayments" pursuant to Medicare provider contracts. 42 U.S.C. § 1395g(a). Attempting to offset the equities in favor of a Trustee requiring a marshalling of all necessary funds to save a popular community institution in the face of grave adversity, HHS counters that it is necessary to replenish the Federal Hospital Insurance Trust Fund, from which payments are made, or "either FICA taxes must be raised, or services must be restricted, to compensate for ... unauthorized expenditures." Reply to Trustee's Consolidated Answer to Motions of the Secretary of Health and Human Services, at 2. While this be a bit of an overstatement of any equities in HHS's favor, this argument does heighten our awareness that any result here in favor of the Debtor may allow less sympathetic debtors to avoid contractual obligations at an ultimate cost to all taxpayers.

It is clear to us that HHS, in presenting these motions, has made a conscientious effort to avoid running afoul of any of the procedural difficulties which have arisen

---

3. Despite this resolution, both parties saw fit to submit unsolicited Supplemental Briefs to us. As we noted in *In re Jungkurth,* 74 B.R. 323, 325–26 (Bankr.E.D.Pa.1987), *aff'd,* 87 B.R. 333 (E.D.Pa.1988), such submissions are not favored. Counsel should have discussed among themselves and then requested court permission to file these briefs, thereby proceding in orderly rather than unpredictable fashion in making submissions to us.

when it has attempted to assert such claims in the past in similar cases arising in other jurisdictions. It has also faced up to most of the difficult issues presented by the cases in other jurisdictions, and has attempted to obtain rulings from this Court before acting. In this regard, we highly commend its professionalism.

Cognizant of the decision in *In re Memorial Hospital of Iowa County, Inc.*, 82 B.R. 478, 484 (W.D.Wis.1988), HHS has sought relief from the stay and a directive that the Debtor be compelled to assume what it argues is an executory provider contract at an early stage in these proceedings. Cognizant of the narrow construction placed upon the concept of setoff, under 11 U.S.C. § 553(a), in, *e.g., Lee v. Schweiker*, 739 F.2d 870, 875–76 (3d Cir. 1984); *In re Windsor Communications Group, Inc.*, 79 B.R. 210, 215–16 (E.D.Pa. 1987); *In re Four Winds Enterprises, Inc.*, 87 B.R. 624, 627, 17 BCD 1033, 1035 (Bankr.S.D.Cal.1988); and *In re Lessig Construction, Inc.*, 67 B.R. 436, 440–42 (Bankr.E.D.Pa.1986), HHS expresses its rights in terms of seeking recoupment rather than setoff. Moreover, it bolsters its recoupment argument by defining its claims as an aspect of the duty to cure which the Trustee must fulfill if he opts to assume an executory contract. *See* 11 U.S.C. § 365(b)(1). This is consistent with the classic analysis of comparable contracts provided in, *e.g., Memorial Hospital*, 82 B.R. at 481–83; *In re Neuman*, 55 B.R. 702, 706 (S.D.N.Y.1985); *In re Ambulance Corp. of America*, 27 B.R. 910, 912 (Bankr. E.D.Pa.1983) (KING, J.); *In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427, 434–35 (Bankr. S.D.N.Y.1982), *aff'd*, 34 B.R. 385 (S.D.N.Y.1983); *and In re Monsour Medical Center*, 8 B.R. 606, 612–15 (Bankr.W.D.Pa.), *aff'd*, 11 B.R. 1014, 1017–18 (W.D.Pa.1981).

It does appear to us that the analysis of HHS presents the strongest case that can be made for its position. Although our decisions in *In re Metro Transportation*, 87 B.R. 338, 342 (Bankr.E.D.Pa.1988); and *In re Fox*, 83 B.R. 290, 294–95 (Bankr.E.D. Pa.1988), emphasize the flexibility of the power accorded to debtors in determining whether contracts are executory and how they are to be treated, we believe, even under those decisions, the Debtor here is left with a difficult argument in disputing that the provider agreements in issue are not executory contracts. Nevertheless, the Debtor does present an appealing argument that HHS is not seeking recoupment pursuant to an executory contract, but is merely attempting to pursue recoupment pursuant to federal statutes. The Debtor therefore suggests that this case should be conceptualized as a governmental body attempting to exercise a statutory right, as was HHS in *Lee v. Schweiker*, and not as a situation involving an executory contract. It is certainly true that the executory contract analogy was never advanced in *Lee v. Schweiker*.[4]

Nevertheless, as we emphasized in the *Metro Transportation* opinion referenced in the foregoing paragraph, at 342, we are disinclined to hold that a debtor has implicitly assumed an executory contract through actions short of presenting a formal motion to assume such a contract to the bankruptcy court. *See also, e.g., In re Whitcomb & Keller Mortgage Co.*, 715 F.2d 375, 378–80 (7th Cir.1983); *In re New York City Shoes, Inc.*, 84 B.R. 947, 960 (Bankr.E.D.Pa.1988); and *In re Speed Fab–Crete of Nevada*, 57 B.R. 720, 723–24 (Bankr.D.Nev.1986). Therefore, we have no difficulty in denying the first of the four motions of HHS recited at page 505 *supra*, which is directly premised upon such reasoning. This leaves for disposition only the motions of HHS seeking to compel the Debtor to assume or

---

**4.** Such an analogy might have been far-fetched, but is possible. The plaintiff-recipient could be said to be entering into an executory contract when she applied for benefits. Therefore, it could have been argued that she was required to accept the burden of recoupments in exchange for the benefit of present payments.

The fact that HHS did not make such an argument in *Lee v. Schweiker* may suggest that making such an executory-contract argument in the presence of the government's claim there based on exclusively statutory rights *is* far-fetched. Therefore, the Debtor's argument that there is no bona fide executory-contract situation here has at least a certain degree of force.

reject its alleged executory contract with HHS and to obtain relief from the automatic stay, under § 362(d), to proceed with recoupment.

As HHS acknowledges, there are two decisions which have ruled in favor of parties situated similarly to the Debtor here, and which held that the debtors, in those cases, were not required to assume a provider contract with HHS and repay the pre-petition Medicare overpayments as a condition for future participation in such a contractual relationship, *In re Advanced Professional Home Health Care*, 82 B.R. 837 (Bankr.E.D.Mich.1988); and *In re Dartmouth House Nursing Home, Inc.*, 24 B.R. 256 (Bankr.D.Mass.1982), *appeal dismissed*, 30 B.R. 56 (Bankr. 1st Cir.1983). However, like the five cases cited at page 507 *supra* as support for its position by HHS, these two cases at least implicitly hold that the provider contracts in issue are executory contracts. *Dartmouth House* declines to require a debtor to reimburse the state for past *Medicaid* overpayments only because of its conclusion that each year's provider agreement is separate, and hence assumption of a current year's contract does not require payment on a contract for a prior year. 24 B.R. at 260–61. In *Advanced Professional*, the court concluded that a provider contract is in essence a contract "to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor," within the scope of § 365(c)(2). 82 B.R. at 843–44. Section 365(c)(2) provides that a contract within its scope, although executory, may *not* be assumed.

Although we have some misgivings in reaching this conclusion, *see* page 507 & n. 4 *supra,* we conclude, at least for the sake of argument, that the rights of the parties are based upon the provider contract between the Debtor and HHS, and that this contract is an executory contract. However, still remaining before us are the crucial questions of whether the Debtor must assume the contract; if so, when it must do so; and whether HHS is entitled to pursue recoupment pursuant to the contract with or without relief from the automatic stay.

With respect to the latter question, we observe that all of the judges of this Court have rejected the broad application of the reasoning of *In re Wheeling–Pittsburgh Steel Corp.*, 54 B.R. 385, 390–91 (Bankr.W. D.Pa.1985); and *In re Sweetwater*, 40 B.R. 733, 741 (Bankr.D.Utah 1984), that § 362 has no application to a contractual relationship within the scope of § 365. *See In re Reice*, 88 B.R. 676, 681–84 (Bankr.E.D.Pa. 1988) (TWARDOWSKI, CH. J.); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 900–01 (Bankr. E.D.Pa.1987) (SCHOLL, J.); and *In re Borbridge & DiSantis*, 66 B.R. 998, 1001–02 (Bankr. E.D. Pa.1986) (FOX, J.). *See also, In re West Electronics, Inc.*, 852 F.2d 79 (3d Cir.1988) (Court of Appeals holds that the government is entitled to relief from the automatic stay to terminate an executory contract, thereby rejecting the reasoning of *Wheeling–Pittsburgh* and *Sweetwater sub silentio* ). This ruling, of course, means that the judges of this Court have presented themselves with the difficult task of reaching a logical result when those two Code sections fail to mesh. The instant case is one such situation.

As we mentioned at the outset of this Opinion, many of the cases in this area apply completely different reasoning than others. Part of the reason for this is the different postures in which the issues analogous to those here were raised in those other cases. Here, to the credit of both parties, they have placed before us all of the difficult issues raised by those cases.

The debtors in *Neuman* and *Yonkers Hamilton* had entered into post-petition agreements assuming, basically, the parties' pre-petition Medicare provider agreement, which the Debtor here has expressly refused to do. In *Neuman,* the debtor sought to modify the post-petition agreement; in *Yonkers Hamilton,* the debtor was replaced by a trustee who attempted to recover, as preferential transfers, payments made pursuant to such a provider agreement. *Cf. In re American International Airways, Inc.*, 74 B.R. 691, *modified*, 75 B.R. 1023 (Bankr.E.D.Pa.1987)

(trustee is generally bound to undertakings of a predecessor debtor-in-possession and generally cannot recover amounts paid under post-petition agreement as preferential transfers). In these factual settings, it is not surprising to note that the courts expressed concern with attempts to extricate debtors' estates from the unpleasant aspects of bargains made and from which benefits had been accepted.

The *Memorial Hospital* court issued its statements regarding the ease of HCFA and Blue Cross in obtaining their desired ends through a § 365(d)(2) motion in the context of a holding that these parties had no just basis for violating the automatic stay in effecting recoupment. 82 B.R. at 479, 480–481. In so holding, the court rejected the reasoning of *Yonkers Hamilton* that recoupment could flow naturally in this situation, without prior relief from the automatic stay. *Id.* at 483–84. The statements regarding § 365(d)(2) were hence dicta, possibly made without the benefit of counter-arguments on this score.

This court, in *Ambulance Corp., supra*, denied an attempt of the debtor to enjoin HHS and Blue Shield of Pennsylvania from setting off pre-petition debts against present payments on the ground that the actions of HHS and Blue Shield were rights of set-off, pursuant to 553(a). This argument is rather severely undercut by the subsequent decision by the Court of Appeals in *Lee v. Schweiker, supra*. Because of the very presence of *Lee v. Schweiker*, HHS now resorts to characterizing the pre-petition payments due to it as "recoupment" rather than "setoff."

Only the *Monsour* case arose on motions pursuant to §§ 365(d)(2) and 362, like the motions before us here. However, unlike the Debtor here, the debtor there attempted to argue that it could assume that part of the provider agreement looking forward, which it unreservedly wished to do, and reject the "executory aspects" which required it to allow recoupment of overpayments. 8 B.R. at 608. This line of argument caused the debtor to directly confront the principle that "assumption or rejection of an executory contract requires an all-or-nothing commitment going forward, and that hence a debtor cannot assume part of an executory contract in the future while rejecting another part." *Metro Transportation, supra*, at 342. *See also, e.g., In re Silver*, 26 B.R. 526, 529 (Bankr. E.D.Pa.1983). Not surprisingly, the *Monsour* court adheres to the principle recited in the foregoing sentence and rejected the debtor's argument. 8 B.R. at 613.

However, despite the distinctions that can be drawn between all of those cases and the instant case, which leads us to the finding that none of them are conclusive of the instant matters before us, the same can be said of the decisions in *Dartmouth House* and *Advanced Professional*, which reach the opposite conclusion. *Dartmouth House* ultimately turns upon the fact that the provider agreements there were found to be annual, severable undertakings.

There is some basis for reaching the same conclusion as did the court in *Dartmouth House* on the facts here. It is greatly troubling to conclude that an unseen and unseeable 1966 contract controls the parties' relationship into perpetuity, while on HHS official posits the clearly-existing 1987 contract is a totally insignificant document. It would not be illogical to conclude that the 1986 fiscal year recoupment is an action taken under the "phantom" 1966 contract, which is distinct from payment of current benefits under the 1987 contract. However, we do not choose to rest our decision on this argument, be it ever so plausible. We do observe that, unlike the provider contracts in issue in *Dartmouth House*, there is apparently no express language in either of the contracts here limiting the terms of any of these agreements to one year or any other finite period. It may be that, here, the Commonwealth did not take the same hard line as HHS as to its rights to recoup present Medicaid benefits because facts similar to those of *Dartmouth House*, which also presented an issue of recoupment of Medicaid benefits, were present. It is, however, somewhat disconcerting to conclude that HHS has superior rights to those of the Commonwealth on the basis of such a technical distinction.

The ultimate reasoning of the *Advanced Professional* case, though applied to facts which appear undistinguishable from those before us, is difficult for us to accept. The court there relies solely upon its characterization of the recoupment aspect of the provider agrement as "debt financing." It therefore concludes that this aspect of the contract cannot be assumed under § 365(c)(2). We question whether the prohibition of § 365(c)(2) is properly allowed to be so used by the debtor as a shield against a portion of a contract which contains an aspect of debt financing. It would, rather, seem to us that an executory contract containing the element of debt financing should be unassumable in its entirety, to avoid a conflict with the principle, enunciated two paragraphs above, that an executory contract must be assumed *in toto* or rejected. Also, the reasoning of the *Advanced Professional* court seems to run contrary to the strict construction of § 365(c)(2), limiting its application to contracts which involve financing exclusively. 3 COLLIER ON BANKRUPTCY, ¶ 365.06, at 375–44 (15th ed. 1988).

We believe that the *Dartmouth House* and *Advanced Professional* courts are driven to their decisions largely by an aura of discomfort in giving a clear-cut priority to the government in collecting its debts over other creditors, thereby impeding the debtor's "fresh start" free from the encumbrance of the governmental creditor. This result is particularly disconcerting when it is recalled that the Bankruptcy Code specifically provides that governmental units should, of all creditors, be disadvantaged in their future dealing with debtors by the dictates of 11 U.S.C. § 525(a), which reads, in pertinent part, as follows:

> § 525. Protection against discriminatory treatment
>
> (a) ... a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

We experience an aura of discomfort whenever a particular creditor attempts to claim an exemption from the normal treatment of creditors and seeks to obtain special treatment by means of a claim of set off against a debtor. As a result, the *Windsor Communications* and *Lessig Construction* passages referenced at page 507 *supra* indicate that setoff, as an exception to equal treatment of creditors, must be narrowly construed.

We see no reason why recoupment, a doctrine even more limited than set off and allowed "only to permit a transaction which is made the subject of a suit by a plaintiff to be examined," *Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296, 299, 67 S.Ct. 271, 272, 91 L.Ed. 296 (1946), should be construed any more broadly than setoff to allow a given creditor special treatment in collecting pre-petition claims against a creditor. Thus, this concept should be narrowly construed as well.

HHS contends that dicta in *Lee v. Schweiker*, 739 F.2d at 875–76, supports its contention that the doctrine in recoupment is properly applied here, even though setoff might not be. However, in that case, the Court of Appeals declined to hold, similar to what HHS is arguing here, that withholding of past benefits constituted "the same transaction" as payment of future benefits. *Id.* at 875. There, the court acknowledges the presence of the *Monsour* and *Yonkers Hamilton* cases, and *In re Berger*, 16 B.R. 236 (Bankr.S.D.Fla.1981), a case rejecting a contempt citation under § 362(a)(7) by a debtor-podiatrist against

HHS, but also cites to *Dartmouth House* as well. *Id.* at 875–76. It then states that the executory-contract theory was utilized in these cases. *Id.* at 876. Finally, it declines to apply the reasoning urged by the HHS to be applied here to the case before it because "[t]he courts have generally taken a different approach in dealing with government benefits to individuals, such as social security." *Id.* at 876.

We cannot say that these pronouncements are even dictum in support of the reasoning of *Monsour, Yonkers Hamilton,* and *Berger.* It appears that, in *Lee v. Schweiker,* the Court of Appeals merely surveyed all of the comparable cases and was able to distinguish even those where the government had prevailed from the facts before it there.

A similar conflict between claims of a creditor to setoff rights on one hand and the principles of equal treatment of creditor and the provision of a clear "fresh start" to the debtor on the other hand surfaces in the cases concerning bank setoffs. *See Cusanno v. Fidelity Bank,* 29 B.R. 810 (E.D.Pa.1983); and *In re New York City Shoes, Inc.,* 78 B.R. 426 (Bankr. E.D.Pa.1987). In both of these decisions, the result was that an "administrative freeze" of a bank account did constitute a setoff, proscribed by 11 U.S.C. § 362(a)(7), unless the bank first obtained relief from the automatic stay allowing it to exercise recoupment rights. In *New York City Shoes,* even considering the impact of 11 U.S.C. §§ 542(b) and 363(c), which the *Cusanno* court did not have presented to it and did not address, we pointed out that the rights of banks to setoff must be weighed against the needs of the debtor to . utilize the liquid assets of its bank account in the reorganization process. *Id.* at 429–31. *See also In re Penn Central Transportation Co.,* 453 F.2d 520, 523 (3d Cir. 1972).

■ We acknowledge the *Cusanno* court's statement that a creditor may forfeit the right to relief from the stay by failing to seek timely relief from the automatic stay. 29 B.R. at 813. We do not think that this passage is meant to imply,

as the Debtor argued here, that, if a creditor once violates the automatic stay, he may forfeit his right to ever obtain relief from it. Rather, we believe that what is meant by this passage is that, in the course of defending against a stay violation, a creditor cannot, as part of a defense, claim that it would have been entitled to relief · from the stay had it asked for same. Thus, we believe what is meant is that the offending creditor must request relief from the stay in a separate motion, like any other party, in order to obtain such relief. *Compare New York City Shoes, supra,* 78 B.R. at 433 (Bank may be granted relief from the stay even though it violated the stay in part by freezing funds to which it clearly had no right). In any event, the Debtor has a very weak argument on this point here because HHS, contrary to its behavior in such cases as *Advanced Professional* and *Memorial Hospital,* was careful to request relief from the automatic stay before unilaterally exercising its purported right of recoupment.

We have previously expressed some reservations as to whether this case presents the issue of assumption of an executory contract as opposed to the government's attempt to enforce a statutory right. We also have some doubt as to whether HHS can set off benefits apparently payable under a 1987 contract against overpayment liabilities which apparently arose under a separate 1966 contract. However, assuming *arguendo* that we rule in favor of HHS as to both of these issues and conclude that the Debtor must decide whether to assume or reject the 1966 provider contract if it wants to remain a Medicare provider, we still could not rule in favor of the Secretary.

We do concede, that ordinarily, an executory contract can be assumed by a debtor if and only if the debtor, *inter alia,* cures pre-petition defaults and/or compensates the obligee for pre-petition "actual pecuniary loss resulting from such default; ..." 11 U.S.C. §§ 365(b)(1), (b)(2). In this sense, the obligee in an executory contract with a debtor does receive priority to other credi-

tors, irrespective of the obligee's rights to setoff or recoupment.

However, what we believe is the ultimate deciding factor here, even assuming *arguendo* that we characterize HHS as an obligee in an executory contract with the Debtor, is the presence of 11 U.S.C. § 525(a). Although other creditors may be entitled to payment of pre-petition debts in exchange for a debtor's assumption of an executory contract, we believe that § 525(a) changes this as to a governmental unit.

In our Memorandum explaining our reasons for granting a preliminary injunction compelling the Defendants in the adversary proceeding to restore the Debtor's PIP schedule, as quoted at pages 505–506 *supra*, we noted our holding, in *Sudler, supra*, that the the public policy of § 525(a) overrides the policy of § 365(b)(1). Similarly, we conclude that, although § 365(b)(1) would otherwise appear to require the Debtor to allow HHS its recoupment rights as a condition for utilization of its Medicare provider contract in the future, § 525(a) eliminates that condition.

Aware that our continued reasoning on this basis would potentially control the outcome of these matters to its detriment, HHS argues that, unlike the housing authority at issue in *Sudler*, it has taken no action against the debtor to collect its pre-petition obligations as a condition for the Debtor's receipt of future benefits from the Medicare provider contract. Indeed, it has not. However, that is because it has wisely refrained from such action pending our determination of its right to collect such obligations. If we held that it *was* entitled to do so, HHS clearly *would* declare that the Debtor's payment of pre-petition indebtedness must be paid as a condition of the benefit of contracting with the government for Medicare reimbursement in the future. Contrary to HHS's arguments, the government *would* then be empowered to collect pre-petition obligations which would otherwise be dischargeable and relegated to unsecured-claim status, solely because the Debtor wished to retain its status as a Medicare provider.

In *In re Watts*, 76 B.R. 390, 402–06 (Bankr.E.D.Pa.1987), we made references to the several types of situations to which § 525(a) has been consistently applied in the past. This included cases where the government has denied debtor-contractors of rights to bid for government contracts, *see, e.g., In re Son–Shine Grading, Inc.,* 27 B.R. 693, 695 (Bankr.E.D.N.C.1983); *In re Marine Electric Railway Products Div., Inc.,* 17 B.R. 845 (Bankr.E.D.N.Y. 1982); *In re Coleman American Moving Services, Inc.,* 8 B.R. 379 (Bankr.E.D.Kan. 1980); and Annot., *Protection of Debtor from Acts of Discrimination by Governmental Units Under § 525 of Bankruptcy Code of 1978 (11 U.S.C. § 525),* 68 A.L.R. Fed. 137, 151–52 (1984), and the cases where public housing authorities attempted to deny future leases to delinquent debtor-tenants because of pre-petition rent obligations. *See In re Szymecki,* 87 B.R. 14, 15–16 (Bankr.W.D.Pa.1988); *Sudler, supra; In re Amhurst,* Bankr. No. 84–02604T (Bankr.E.D.Pa. March 8, 1984); *In re Gibbs,* 9 B.R. 758, 763–64, *reaff'd,* 12 B.R. 737 (Bankr.D.Conn.1981), *aff'd in pertinent part,* 76 B.R. 257 (D.Conn.1983); and Annot., *supra,* 68 A.L.R.Fed. at 152–53. *But see In re Lutz,* 82 B.R. 699, 705 n. 1 (Bankr.M.D.Pa.1988).

We believe that the action by HHS can be analogized to that which the governmental units were prohibited from taking in the foregoing cases. The governmental units there were, in one sense, not treating the debtors there differently from similarly-situated persons. Rather, in the government-contract cases, the governmental units in issue would have denied bidding rights to any contractors in the financial straits of the above debtors. Similarly, in the public-housing cases, the public housing authorities in issue would attempt to evict any tenant owing back rent, whether the tenant was in bankruptcy or not. The significant fact in these cases is not that the government would act against non-debtors situated similarly in the same way that it proposed to act as to the debtors, but that it refused to refrain from acting in light of the fact that the respective debtors' obligations to the governmental units in issue

were to be paid through their bankruptcy estate and/or discharged. The public housing prototype is particularly appropriate because the governmental unit there is in the role of the quintessential obligee in an executory contract: a landlord. Where a non-governmental-unit landlord could indisputably insist that the debtor-tenant effect a cure of the executory-contract lease to remain a tenant entitled to possession, the governmental-unit landlord was held not to be able to do so.

We recognize that none of the foregoing cases involving assumption of medical provider contracts utilize § 525(a) as a basis for analysis. However, as we noted in *Watts,* Congress expressly encouraged the courts to stretch the contours of the antidiscrimination ban in § 525(a) beyond its traditional roles in preventing debtors from obtaining drivers' licenses, liquor licenses, and school transcripts. 76 B.R. at 402–03. Furthering the "fresh start" of the Debtor here by unshackling it from pre-petition Medicare overpayment liabilities is precisely the policy enunciated in the fountainhead of § 525(a), the Supreme Court's decision in *Perez v. Campbell,* 402 U.S. 637, 648, 91 S.Ct. 1704, 1710, 29 L.Ed.2d 233 (1971). It seems to us a very small step from the application of § 525(a) to the public housing cases to its application to the instant facts.

We therefore reaffirm our tentative conclusion, in our Memorandum of June 24, 1988, that § 525(a) bars HHS from requiring that the Debtor repay its pre-petition indebtedness as a condition for assuming its Medicare provider contract with HHS.

We believe that this conclusion allows the Debtor to assume its provider contract with HHS without the necessity of being subjected to recoupment for past overpayments. However, we also address the Debtor's alternative argument that it should not be required to assume or reject its contract with HHS at this juncture, but should be allowed to postpone this determination until the normal time for doing so under 11 U.S.C. § 365(d)(2), *i.e.,* at confirmation.

■ The Debtor recognizes that § 365(d)(2) allows this court to direct that the trustee "determine within a specified period of time" *prior* to confirmation "whether to assume or reject" an executory contract. As we indicated in *Grant Broadcasting, supra,* a § 365(d)(2) motion must be resolved by weighing " ' "the nature of the interests at stake, the balance of hurt to the litigants, the good to be achieved, and the safeguards afforded those litigants." ' " 71 B.R. at 902 (quoting *In re Lionel Corp.,* 23 B.R. 224, 225 (Bankr.S.D.N.Y.1982), which in turn was quoting *In re Midtown Skating Corp.,* 3 B.R. 194, 198 (Bankr.S.D.N.Y.1980)). Of course, in deciding a § 365(d)(2) motion and weighing these considerations, a bankruptcy court is empowered to deny the motion and allow the debtor to wait until the normal deadline of confirmation to assume or reject the contract. *See, e.g., Whitcomb & Keller, supra,* 715 F.2d at 739, *In re Dunes Casino Hotel,* 63 B.R. 939, 949–50 (D.N.J.1986); and *Wheeling–Pittsburgh, supra,* 54 B.R. at 388–89.

■ The interests of the Debtor here in denying a precipitous assumption or rejection appear to us much greater than the interests of HHS in forcing a prompt resolution, irrespective of the outcome of the issue of the Debtor's obligation to allow HHS to affect recoupment on account of its pre-petition indebtedness. The delay has not been long. The case is young. The Trustee has been in place only a little more than sixty (60) days, succeeding a suicidal management team. There are already stirrings towards a negotiated Plan of Confirmation. HHS would be ill-advised to deny a provider agreement to such a popular and useful community institution in any event.

Likewise, the balance of hurts and good to be achieved is definitely in favor of allowing the Debtor to delay in this decision. The Debtor is in a period of cashflow crisis, nursing itself back to fiscal health after its previous management team was deposed by means of nursing more and more patients back to physical health. HHS is unlikely to topple due to a delay in collection of any sums due to it. The fact

that the Debtor was undercompensated in fiscal year 1987 suggests that the Debtor is not amassing any further indebtedness to HHS as time passes.

The Debtor appears to be on a path to recovery under the aegis of the Trustee. HHS's rights to ultimate collection of its claims in full, and those of another government agency-creditor, the United States Department of Housing and Urban Development, are likely to be enhanced by giving the Trustee a free rein in determining whether to accept or reject the contract at this juncture.

Had we concluded that the Debtor was compelled to allow HHS to recoup its pre-petition indebtedness as a condition of the Debtor's assumption of the Medicare contract, the weight of factors in favor of allowing the Debtor to abide confirmation before deciding whether it wishes to assume or reject the provider agreement prior to confirmation would have been even heavier. In that case, the Debtor would have been faced with the difficult choice of whether assumption of the provider contract was worth the baggage of liability attached to it. Our decision that this baggage is released eases, if anything, the burden upon the Trustee in making this choice. We therefore conclude that HHS's motion pursuant to § 365(d)(2) must unequivocally be denied.

Finally, given our decision that HHS has no right to recoupment or set off to assert its claims to collect past Medicare overpayments, there is no "cause" to allow it relief from the stay, pursuant to 11 U.S.C. § 362(d)(1). Its interests as an unsecured creditor in collecting the amount due from the 1986 fiscal year over-payment are adequately protected by the claim process, in which it will be treated equally with the other creditors of the Debtor.

Therefore, while commending HHS for the professional manner in which it has conducted itself throughout the presentation of these motions, undoubtedly motivated in part by its own sympathies for the Debtor, we are compelled to rule against it on every issue before us to assure furtherance of the issues of equality of treatment of HHS with all of the Debtor's other creditors, and to assure the Debtor a "fresh start" after its earlier, false start under its previous management. An Order granting the Debtor a permanent injunction on the second, remaining Court of its Complaint and denying the three pending motions of HHS will therefore be entered.